Charles A. SAWYER, Plaintiff–Appellee,

v.

**SWIFT & COMPANY,**
Defendant–Appellant.

No. 85–2801.

United States Court of Appeals,
Tenth Circuit.

Jan. 7, 1988.
Rehearing Denied March 15, 1988.

**1258**

William H. Berger, U.S. Dept. of Labor, Atlanta, Ga. (Benjamin L. Burgess, Jr., U.S. Atty.; Robert S. Streepy, Asst. U.S. Atty.; George R. Salem, Deputy Sol. of Labor; John F. Depenbrock, Associate Sol. of Labor, Washington, D.C.; Tedrick A. Housh, Jr., Regional Solicitor, U.S. Dept. of Labor, Kansas City, Mo., with him on the brief), for plaintiff-appellee.

Daniel B. Denk of McAnany, Van Cleave & Phillips, Kansas City, Kan., for defendant-appellant.

Before MOORE and BARRETT, Circuit Judges, and ANDERSON,[*] District Judge.

BARRETT, Senior Circuit Judge.

Swift & Company (Swift) appeals the Judgment and Order of the United States District Court for the District of Kansas, finding that Swift violated 38 U.S.C. §§ 2021(b)(3) and 2024(d), the Veterans Reemployment Rights Act (Act), in its treatment of Charles A. Sawyer (Sawyer). Sawyer was an employee of Swift from December 8, 1980, until January 10, 1983, and a member of the Navy Reserves beginning for purposes of this case in October, 1982.

The District Court decided the case on the parties' joint motion for declaratory judgment based on stipulations of fact and deposition testimony. The court's Memorandum and Order appears at 610 F.Supp. 38 (D.Kan.1985). The stipulations considered by the trial court are as follows:

1. Defendant is a corporation maintaining a place of business at 4612 Speaker Road, Kansas City, Kansas.

2. Plaintiff was employed by defendant on December 8, 1980, in an other than temporary position as a mechanic and was discharged on January 10, 1983.

3. Plaintiff joined the Navy Reserve in October, 1982, a component of the Armed Forces of the United States, and was assigned to a Naval Reserve Unit in Memphis, Tennessee. The plaintiff would meet a military transport plane at Richards–Gebaur Airport at 6:00 p.m. on the Fridays preceding his drills for transportation to Memphis.

4. Plaintiff was scheduled to perform inactive duty training with his Naval Reserve Unit in Memphis, Tennessee on December 11 and 12, 1982.

5. Plaintiff attended a second step grievance hearing at Swift & Company on December 9, 1982. Also present at the hearing were Stan Hall, Lucille White, Henry Duron, Ron Lupardus, Steve Dickey, and Pat Holland. Plaintiff contends that at this hearing he gave defendant verbal notice of his make-up drill the first nonholiday weekend in January, 1983. Defendant alleges there was no such notice given.

6. The plaintiff did not work at Swift & Company on Saturday, December 11, 1982.

7. The plaintiff's supervisor at Swift & Company was Jerry Kaprol. Steve Dickey was employed in December, 1982, as Chief Engineer.

8. Plaintiff was a union steward for Local 122, National Brotherhood of Meat Packers and Industrial Workers.

9. Plaintiff rescheduled his make-up inactive duty training originally scheduled at Memphis for December 11 and 12, 1982, with the Naval Reserve Unit at Olathe, Kansas, for January 8 and 9, 1983.

10. The plaintiff's shift at Swift & Company was from approximately 2:00

* The Honorable Aldon J. Anderson, Senior United States District Judge for the District of Utah, sitting by designation.

p.m. to approximately 10:30 p.m. weekdays.

11. Defendant's objection to plaintiff's attending inactive duty training in Memphis was based on the fact that the plaintiff had to leave work early on Fridays preceding reserve drills.

12. On January 6, 1983, defendant posted a list of employees scheduled to work on Saturday, January 8, 1983. Plaintiff's name appeared on this list.

13. Plaintiff attended his make-up inactive duty training at the Naval Reserve Unit, Olathe, Kansas, on January 8 and 9, 1983, and did not report to his scheduled overtime work at Swift & Company on January 8, 1983.

14. Plaintiff attended inactive duty training at the Naval Reserve Unit in Memphis, Tennessee, in October and November, 1982.

15. There were eight mechanics on plaintiff's shift.

16. Every employee assigned to work on January 8, 1983, was a mechanic.

17. The plaintiff had been disciplined on occasions prior to January 10, 1983, for his work attendance record at Swift & Company and was accordingly in the progressive disciplinary mode.

18. The plaintiff was scheduled to work on January 8, 1983, and he did not report for work on such date.

19. The plaintiff returned to work on January 10, 1983, and he was indefinitely suspended, and subsequently discharged by defendant.

The issues thus presented for the trial court's determination were: (1) the responsibility of Swift to allow Sawyer a monthly absence from work on Friday evenings in order to travel from Kansas City to Memphis, Tennessee, for his weekend training drills; (2) whether Sawyer gave Swift adequate notice that he would attend a make-up drill in Olathe, Kansas, on January 8–9, 1983, in lieu of assigned overtime that weekend; and (3) whether Sawyer was ter-

minated as a result of his attending military reserve training on January 8–9, 1983.

The trial court found with respect to the first issue that because 38 U.S.C. § 2024(d) provides that a leave of absence from work "shall upon request be granted ... for the period required to perform ... inactive duty training," Swift was obligated to allow Sawyer to leave early on Fridays to attend training drills. Swift apparently does not dispute this finding. With respect to the other two issues, the trial court found that Sawyer gave adequate notice during the December 9, 1982, second-step grievance hearing that he would be absent the "first nonholiday weekend in January, 1983" for a make-up drill in Olathe, Kansas and that Sawyer was terminated in violation of 38 U.S.C. § 2021(b)(3)[1] as a direct result of attending that drill. The court ordered reinstatement and back pay and ruled that the back pay could not be reduced by the unemployment compensation Sawyer collected after he was fired. Swift has appealed these three determinations.

## DISCUSSION

Our standard of review is set forth in Fed.R.Civ.P. 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." This standard may be problematic when the trial court bases its findings of fact upon deposition testimony and stipulations by the parties. Nevertheless, the clearly erroneous standard applies to all cases where the trial court makes findings of fact. *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). *Anderson* summarizes certain general principles that may be gleaned from the cases. The foremost of these is that "[a] finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has

---

**1.** 38 U.S.C. § 2021(b)(3) provides:
Any person who [is in the employ of a private employer] shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

been committed.'" *Id.* at 573, 105 S.Ct. at 1511. On the other hand, the reviewing court may not reverse the trier of fact merely because it might have decided the case differently, nor can it decide factual issues *de novo. Id.* Finally, where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Id.* at 574, 105 S.Ct. at 1512. Bearing these standards in mind, we will discuss each issue raised by Swift.

## I.

The trial court's determination that Sawyer gave adequate notice of his intention to make up his December training drill during the weekend of January 8–9, 1983, is a conclusion of law based on a factual finding that Sawyer did bring the matter up at a second step grievance hearing on December 9, 1982. We do not question the trial court's factual finding, since the evidence was in conflict on this point and the trial court must choose the more credible version. Still, on the basis of the entire record, we do question the court's conclusion.

First, we observe that legal authority on the subject of what constitutes proper notice to an employer under 38 U.S.C. § 2024(d)[2] is sparse. In *Blackmon v. Observer Trans. Co.*, 102 C.C.H. Labor Cases ¶ 11, 450 at 23, 913 (W.D.N.C.1982) [Available on WESTLAW, 1982 WL 805], the court was asked to decide whether mention of a reserve obligation by a driver at a drivers' meeting convened for general purposes constituted proper notice under the Act. The court sidestepped the issue by finding that because no one could corroborate the employee's contention, the employee had not in fact made the request. We can find no other cases that squarely address such an issue.

In the instant case, we accept the trial court's finding that during a grievance hearing in December, Sawyer brought up the fact that he needed to make up his reserve obligation on "the first nonholiday weekend in January." We also note that the primary purpose of the grievance proceeding was to consider two grievances filed by Sawyer: the first because he was not scheduled to work overtime on a Friday holiday in November, and the second because he was disciplined for not wearing a beard net. We also note that no witness remembered Sawyer giving a specific date. Further, the record shows that later in December, Sawyer gave Patrick Holland, the personnel manager, a copy of his orders for a January 22 drill. The orders contained nothing pertaining to the January 8 drill, nor did Sawyer mention it (R., Vol. VII, pp. 28–30). Finally, when the overtime list was posted on January 6, the evidence is undisputed that Sawyer failed to inform anyone that his name should not have been on the list and that he would not be working on January 8. The trial court excused this, saying it was not unreasonable for Sawyer to fail to remind Swift that he needed the weekend off, in light of the fact that Swift had denied Sawyer time off in December to fly to Memphis. This misses the mark, since the makeup drill was in Olathe and did not necessitate travel time on Friday night. Moreover, several Swift witnesses testified without contradiction that they told Sawyer that Reserve drills on Saturdays and Sundays were no problem. Looking at the record as a whole, it is clear to us that although Sawyer did mention a makeup drill to take place the first nonholiday weekend in January, later events proved this statement ineffective as notice to Swift. Sawyer's reserve status did not eclipse his ordinary obligations to his employer, including his obligation to

---

**2.** 28 U.S.C. § 2024(d) provides:

Any employee [in private employment] shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training or inactive duty training in the Armed Forces of the United States.

The phrase "upon request" has been interpreted to mean "after proper notice." *Rodgers v. Missouri Pacific R. Co.*, 82 C.C.H. Labor Cases ¶ 10, 222 at 16, 859 (E.D.Ill.1977) [Available on WESTLAW, 1977 WL 1736]; *Blackmon v. Observer Trans Co.*, 102 C.C.H. Labor Cases ¶ 11, 450 at 23, 913 (W.D.N.C.1982) [Available on WESTLAW, 1982 WL 805].

notify or remind Swift, at any time from January 6 up to one hour before his shift was to begin on January 8, that he had a prior commitment. On this record, notice was clearly inadequate: it was not understood and acted upon, and Sawyer knew or should have known it. Had Sawyer not been in the Reserves and had the same situation occurred, Swift would have been justified in terminating Sawyer. His record was replete with unexcused absences and tardiness, and it is undisputed that he was one infraction away from termination.

We hold that under the circumstances of this case, the trial court's conclusion that notice was adequate was clearly erroneous.

## II.

The trial court's finding that Sawyer was terminated in violation of 38 U.S.C. § 2021(b)(3) is premised on its conclusion that he gave adequate notice of his January 8 drill obligation. Because he was fired after attending this drill, the court found the conclusion inescapable that Sawyer was terminated because of his reserve status. The trial court did not discuss the role of *Monroe v. Standard Oil Co.*, 452 U.S. 549, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981), except to dismiss it as inapplicable to the issue, not under appeal here, of whether Swift was required to give Sawyer travel time on Friday evenings.

In our view, *Monroe* cannot be ignored, despite its factual dissimilarity to the instant case. The issue in *Monroe* was whether an employer was required to make scheduling accommodations for employee-reservists. The Court held an employer did not have to make such accommodations because § 2021(b)(3) was intended and enacted for the limited purpose of protecting reservists from discrimination based solely on their reserve status. If scheduling accommodations would not be made for employees without military obligations, they would not be made for employee-reservists. *Monroe*'s importance to the instant case is two-fold.

First, it requires an analysis in terms of an employer's treatment of non-reserve employees. If a non-reserve employee in Sawyer's position would be terminated for the same conduct, Sawyer's reserve status cannot insulate him. If, on the other hand, a non-reserve employee would not be terminated for the same conduct, it becomes obvious that the reasons given for termination were pretextual. The evidence showed that other employees had been disciplined or terminated for missing scheduled overtime on Saturdays. (R., Vol. VII, pp. 40–42). Sawyer was in the "progressive mode" of the disciplinary progression, which meant that one more infraction on his part would result in termination. (R., Vol. VII, pp. 55–57). Moreover, there were a number of other reservists at Swift who were given time off with no problems. (R., Vol. VIII, p. 27). On this basis, it would be difficult to conclude that Sawyer was discriminated against because of his reserve status.

The second way *Monroe* is significant is that it suggests a much more stringent standard for cases brought under § 2021(b)(3) than for those brought under other federal labor statutes, which apparently require a "but-for" test. At 452 U.S. 559, 101 S.Ct. at 2516, the Court states:

> The legislative history thus indicates that § 2021(b)(3) was enacted with a significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated *solely* by reserve status (emphasis supplied).

Again at 559–60, 101 S.Ct. at 2516–17:

> Congress wished to provide protection to reservists comparable to that already protecting the regular veteran from *'discharge without cause'*—to insure that employers would not penalize or rid themselves of returning reservists after a mere pro forma compliance with § 2024(d) (emphasis supplied).

And yet again at 565, 101 S.Ct. at 2519:

> The frequent absences from work of an employee-reservist may affect productivity and cause considerable inconvenience to an employer who must find alternative means to get necessary work done. Yet Congress has provided in § 2021(b)(3)

that employers may not rid themselves of such inconveniences and productivity losses by discharging or otherwise disadvantaging employee-reservists *solely* because of their military obligations (emphasis supplied).

In *Clayton v. Blachowske Truck Lines,* 640 F.Supp. 172 (D.Minn.1986), the court applied the standard set forth in *Monroe* to a situation similar to the case at bar. Plaintiff was the safety director for a trucking firm whose duties included working on Saturdays. He informed his employers before accepting the position that he had Minnesota National Guard drills one weekend a month and was assured there would be no problem. After approximately four months, plaintiff was terminated for poor job performance. Among the specific reasons were plaintiff's frequent absences on Saturdays. Plaintiff asserted that this reason implicated his National Guard status, thereby violating § 2021, and that it was a material issue of fact whether the other reasons were pretextual and thus precluded summary judgment. Citing *Monroe,* the court held:

> Even when viewed in a light most favorable to plaintiff the record before the court shows that plaintiff was not terminated solely because of his reserve status. It is undisputed that defendants knew when they hired plaintiff that he was in the National Guard and that they assured plaintiff that these obligations would be no problem. It is also undisputed that plaintiff was given several reasons for his termination. Three of the four reasons ... were unrelated to his guard duties and are supported by the evidence. Moreover, defendants have pointed to additional reasons for termination which are well supported by the sworn statements of a number of witnesses.... For these reasons, the court concludes as a matter of law that plaintiff was not terminated solely because of his National Guard obligations. 640 F.Supp. at 174.

On appeal, the the trial court was affirmed in *Clayton v. Blachowske Truck*

*Lines,* 815 F.2d 1203 (8th Cir.1987). We can find no other circuit court cases construing 38 U.S.C. § 2021(b)(3) and the language in *Monroe* within a similar factual context. In our view, the language in *Monroe* is plain and must be construed as in *Clayton.*

In the instant case, as in *Clayton v. Blachowske Truck Lines, id.,* it is clear that even if Sawyer's reserve status played some role in his termination, there were sufficient other, non-pretextual, reasons irrelevant to his military status. Sawyer's disciplinary problems antedated his joining the Reserves by nearly two years. In fact, his pattern of absenteeism started very shortly after his employment at Swift began. And the witnesses were unanimous in saying that Swift would not have terminated Sawyer if management had known in advance that Sawyer would not be working on January 8. We cannot conclude as a matter of law that Sawyer was terminated solely because of attending Naval Reserve training on January 8, 1983. Rather, we conclude that Sawyer was terminated for valid reasons of absenteeism and tardiness, having little, if anything, to do with his Reserve obligations.

Having reached this conclusion, we need not consider the issue of whether Sawyer's back pay award should be reduced by the amount of his employment compensation.

For the above reasons, we hold the trial court's conclusions as to the issues discussed herein are clearly erroneous and we must REVERSE.