**William M. GUMMO, Plaintiff–Appellant,**

v.

**VILLAGE OF DEPEW, NEW YORK, Defendant–Appellee.**

No. 578, Docket 95–7551.

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1995.

Decided Jan. 19, 1996.

Glenn Edward Murray, Buffalo, New York (Murray & Coleman, Buffalo, New York, on the brief), for plaintiff-appellant.

Paul D. Weiss, Buffalo, New York (Weiss & Stein, Buffalo, New York, on the brief), for defendant-appellee.

Before: KEARSE and WINTER, Circuit Judges, and POLLACK, District Judge.*

KEARSE, Circuit Judge:

Plaintiff William M. Gummo, a member of the United States Air Force Reserves formerly employed by the Police Department of defendant Village of Depew, New York ("Village"), appeals from a judgment of the United States District Court for the Western District of New York, John T. Elfvin, *Judge*, dismissing his complaint alleging that the Village terminated his employment in violation of the Veterans' Reemployment Rights Act, 38 U.S.C. § 2021 et seq. (1988) (current version at 38 U.S.C. § 4301 et seq. (1994)) (the "Act" or "VRR Act"). The district court granted the Village's motion for summary judgment on the ground that Gummo could not show that his termination was motivated solely by, or had any causal relationship to, his reserve status. On appeal, Gummo contends principally that summary judgment dismissing his complaint was improper because the district court erred in applying the sole-motivation test and because there were genuine issues to be tried with respect to

causation. He also contends that he was entitled to a partial summary judgment in his favor ruling that the Department's policy of refusing to grant military leave without the submission of written official orders violated § 2024(d) of the Act. For the reasons that follow, we agree that the district court erred in granting summary judgment, and we therefore vacate the judgment and remand for further proceedings.

## I. BACKGROUND

Except to the extent indicated, most of the background events do not appear to be in dispute.

### A. *Gummo's Employment With the Police Department*

From 1977 until his discharge in January 1990, Gummo was employed as a police officer by the Depew Police Department. In December 1986, he enlisted in the United States Air Force Reserves ("Reserves") and was assigned to military duties at the Air Force base in Niagara Falls, New York, some 30 miles from Depew. Gummo's military obligations required him to participate in training sessions one weekend each month at the Air Force base and to attend a two-week tour of training each year ("annual tour") at a site designated by the Air Force. As a municipal employee, Gummo was entitled under state law to be paid his salary during any less–than–30–day absence for military training. *See* N.Y.Military Law § 242(5) (McKinney 1990).

The Depew Police Department's policy was to grant requests for paid military leave when reservists presented to the Department their official written orders specifying the dates of their military training. Until October 1988, Gummo complied with that policy. In that month, Gummo submitted a handwritten note indicating his weekend military training dates for November and December 1988. Police Captain James A. Brennan instructed Gummo to submit his official written military orders for all of fiscal 1988–1989.

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

Gummo promptly complied in part, submitting orders for his weekend tours but not for his annual tour. On December 25, he notified Brennan that his next annual tour was scheduled for June 10–24, 1989, but he did not submit official written military orders at that time.

In January 1989, Gummo was instructed to meet with Police Chief John T. Maccarone to discuss Gummo's failure to provide the Department with the official orders for his annual tour. The parties have different views as to what occurred at the meeting. Gummo asserts that Maccarone questioned him about his military leave and that Maccarone cursed at him, called him a liar, a sneak, and a disgrace to the uniform, and twice threatened to "get" him. The Village asserts that at the meeting, Gummo yelled and screamed at Maccarone without restraint and became threatening. In any event, there appears to be no dispute that the meeting was rancorous, that Gummo left the meeting peremptorily without having been dismissed, and that as he was leaving he said, in the presence of other Police Department employees, "Somebody should choke that man." As a result of this incident, Gummo was charged with several counts of misconduct, including conduct unbecoming a police officer, disobedience of an order, and insubordination to a superior officer. He was found guilty on most counts and was suspended for 30 days without pay.

In May 1989, Gummo notified Captain Brennan in writing that the start of his annual tour had been rescheduled from June 10 to June 9. Gummo attached his official written military orders, which authorized him to receive 16 days of leave for military duty (June 9–24), as well as one day of leave for travel to the Air Force base. The orders stated that he was to report at the Air Force base on June 9 at 7:30 a.m.

Gummo was scheduled, however, to work the night shift on June 8, starting at 11:00 p.m. and ending at 7:00 a.m. on June 9 (the "June 8–9 night-shift"), i.e., a shift ending 30 minutes before the start of his annual tour at the Air Force base. On June 7, 1989, he submitted to Captain Brennan a written request for military leave from that shift in order to have time to prepare for and travel to the annual training session. The request was initially denied by Maccarone on the ground Gummo had not submitted military orders with his request.

On June 8, Gummo renewed his request to be relieved of the June 8–9 night-shift assignment; Maccarone advised Gummo that he could either trade shifts with another officer or obtain official written military orders indicating that he should be relieved of his assignment to the June 8–9 night-shift. On the afternoon of June 8, Gummo informed Maccarone that official notice from the Air Force concerning his military leave for that evening would be mailed to the Police Department. The Village states that Gummo said the official "orders" would be sent; Gummo asserts that he said a "letter" would be sent. Based on his June 8 conversation with Gummo, Maccarone instructed Captain Brennan to remove Gummo's name from the June 8 duty roster and informed Gummo that he would be granted the additional day of military leave.

Gummo asserts that sometime after 7:00 p.m. on June 8, he learned that the letter he had expected from the Air Force, authorizing military leave for that night's shift, would not be forthcoming. Gummo therefore reported for work at the Department at 11:00 p.m. on June 8. He worked until 3:00 a.m. on June 9, and was then driven home by the police lieutenant on duty. He went to the Air Force base at Niagara Falls to begin his annual tour of military duty a few hours later.

When Gummo returned to work following the completion of his annual tour, Maccarone summoned him to discuss the Department's nonreceipt of the written authorization Gummo had promised with respect to Gummo's June 8 military leave. When asked about his statement that written "orders" supporting the June 8 military leave had been mailed to the Department, Gummo stated that he had said a "letter" would be sent to the Police Department, having been told by an Air Force base secretary, whom he identified by her first name, that a letter would be sent. Gummo refused to reveal the name of the person who had thereafter informed him that

no such letter would be sent on June 8, despite being ordered by Maccarone to do so, insisting that that information was irrelevant. Several times during the meeting, Gummo asked to be allowed to have counsel or a nearby union representative present to assist him before answering further questions, but Maccarone denied his requests. After responding to a series of questions about his eventual decision to report for work on June 8, Gummo declined to make any further statements unless he was permitted to have someone there to assist him.

Following that meeting, Gummo was charged with four counts of violating Police Department regulations, and in July 1989 he was suspended from the Department pending the resolution of the disciplinary charges. The Village appointed an impartial hearing officer to conduct an administrative proceeding. After a two-day hearing, the officer dismissed one of the charges, but found Gummo guilty of the other three, to wit, falsely advising the police chief that military orders were in the mail; disobeying a lawful order by refusing to answer questions relating to the events of June 8, 1989; and falsely stating to Maccarone that he had never claimed that military "orders" were being sent to the Department. In light of the finding of guilt and of Gummo's prior disciplinary record, the hearing officer recommended that Gummo be dismissed from the Police Department.

The Village accepted the recommendation and, in January 1990, terminated Gummo's employment with the Department. Gummo initiated a state-court challenge to his discharge but did not perfect that challenge.

B. *The Proceedings in the District Court*

Gummo commenced the present suit in March 1993, alleging that his two suspensions and the termination of his employment violated the VRR Act because those actions were motivated by his "status and duty as a member of the armed forces." (Complaint ¶ 23.) He principally sought reinstatement and compensation for lost wages and other lost benefits. After a period of discovery, the Village moved for summary judgment dismissing the complaint. In support of its motion, the Village submitted, *inter alia,* the affidavit of Maccarone, the depositions of Maccarone and Gummo, and affidavits of three other Depew police officers who were or had been reservists and who stated that they had never been subjected to discrimination by the Department on that basis. The Village took the position that it had terminated Gummo's employment only because of his insubordination and other misconduct and not because of his reserve status.

Gummo opposed summary judgment. In Maccarone's deposition, Gummo had elicited testimony as to Maccarone's views with regard to the statutory benefits accorded to reservists. For example, Gummo brought out that some years earlier David Gorski, one of the police-officer reservists who submitted an affidavit in the present case stating that he had never been discriminated against on the basis of his reserve status, had once complained to the United States Department of Labor about the Police Department's treatment of him as a reservist:

Q. Did you ... ever complain to the Department of Labor about any reservists or laws that govern reservists?

A. I didn't complain to the Department of Labor. Lieutenant Gorski complained to the Department of Labor and as a result, they did an investigation.

(Deposition of John T. Maccarone ("Maccarone Dep.") at 36.) Maccarone testified that in the wake of Gorski's complaint, a Department of Labor official, Frank Curry, had come to see him and that the gist of their conversation was as follows:

I'm quoting him. "You can't touch [Gorski]. They can do what they want. They can tell you. They don't have to give you a written order on anything. If they want the day off before, they can do it. If they want the day off after, they can take it, you have to accept it." I said, "You're out of your mind."

(Maccarone Dep. at 39.) The Department of Labor, as a result of its investigation, found that, with the exception of one conceded misdeed, Gorski had done "absolutely nothing wrong" with regard to his reservist status

and requests. (*Id.* at 36.) Maccarone apparently disagreed:

Q. Were you—did you agree with the—did you agree with the outcome of the Department of Labor investigation?

A. No, I did not.

Q. Why?

A. It was obvious from the minute that Mr. Frank Curry walked in my office that he was not an impartial investigator, that his sole purpose in life was to protect the reservist.

Q. And that bothered you?

A. Tremendously.

Q. And did you express any unhappiness toward Mr. Curry?

A. I ordered him out of my office.

(Maccarone Dep. at 37–38.)

Maccarone testified that he generally believed that, though most municipalities could afford the expense, reservists should not receive their full municipal salaries while they were on paid reserve duty. (*Id.* at 33.) He had sent a municipal official a letter (*id.* at 32), which was quoted in a local newspaper, seeking legislation against what he had referred to as " 'double dipping in its most flagrant form.' " *The Depew Lancaster Metro Community News* at 3D (Jan. 22, 1989) (quoting Maccarone letter).

With respect to the events at issue in the present action, Maccarone indicated that Gummo had been denied a promotion, and Maccarone stated his view that Gummo was attempting to force the Department to adhere to "the military law right by the letter of the law" as a means of retaliation for the denial:

A. .... Mr. Gummo was not a problem with his reserve status from the day he signed up until the day he discovered he was not going to be successful lieutenant candidate. Then he started a course of action that turned him completely around.

. . . .

Q. What is it—what kind of—after that day forward, did Mr. Gummo abuse his rights as a reservist?

. . . .

THE WITNESS: I don't know if you'd call it his abuse of his rights, his reservist status. I would call it an abuse of the departmental status. What he was doing was he was attempting to use his official military status as a weapon to retaliate and get even with myself and the department.

. . . .

Q. .... And how was it—

A. And he was doing things like writing—do these things like writing [a certain] letter to the editor.

Q. But the letter had nothing to do with his military status?

A. That's right. But these are the things he started doing. And then he started doing things with his schedule. He wouldn't be up front as he was in the past about producing his weekend schedule. He wouldn't be up front about producing his two-week tour schedule. He was just being everything—doing everything to be obstinate to show that he didn't have to cooperate. And he started calling the military law right by the letter of the law. "I don't have to give you this and I don't have to give you that."

(Maccarone Dep. at 74–76.) Maccarone stated that this "bother[ed]" him because "I'm his employer. He has another obligation through his employment...." (*Id.* at 76.)

In his own deposition, Gummo had testified to his version of the January 1989 meeting with Maccarone, stating that Maccarone had accused him of lying about his military leave and had promised to "get" him, which Gummo interpreted as meaning that Maccarone meant to retaliate for Gummo's insistence on his rights under the VRR Act. (Gummo Dep. at 187–89.) Thus, in opposition to summary judgment, Gummo contended that the Village's decision to terminate his employment was based on his status as a reservist and that summary judgment could not properly be granted against him. He also cross-moved for partial summary judgment in his favor, contending that the Department's policy of refusing to grant reservists leave without receiving written military orders was unlawful.

In a Memorandum and Order dated April 28, 1995, 1995 WL 264665 ("Opinion"), the district court denied Gummo's motion and granted that of the Village. Stating that the purpose of the Act "is to prohibit employment discrimination against Reservists 'motivated solely by reserve status,'" Opinion at 7 (quoting *Monroe v. Standard Oil Co.*, 452 U.S. 549, 559, 101 S.Ct. 2510, 2516, 69 L.Ed.2d 226 (1981)), the court concluded that the Act is inapplicable where "a Reservists's employment is terminated for reasons other than his status," Opinion at 7. The court noted that:

> [t]he record is replete with evidence of Gummo's refusal to obey orders, insubordination and failure to comply with the Department's policies. He does not controvert most of this evidence but disputes the characterization of such as "misconduct." Regardless of how these uncontroverted facts are characterized, it was found during the [administrative] proceeding that Gummo was guilty of misconduct such as to constitute good cause for discharge.

*Id.* Finding that Gummo was collaterally estopped from challenging these administrative findings in a proceeding in federal court, the district court ruled that the Village was entitled to summary judgment because "[a]s a matter of law ..., Gummo's Reserve status was not the sole reason for his discharge." *Id.* at 8.

The district court further reasoned that even if Gummo could relitigate the findings of misconduct, he had offered no evidence indicating that he had been suspended or discharged because of his reserve activities. Rather, it found, Gummo's "entire argument rest[ed] on his allegation that the defendant's requirement that written orders be submitted prior to being granted military leave is 'unlawful'.... [and] that but for the defendant's policy, he would never have gotten into the arguments with Maccarone that resulted in his discharge." *Id.* The court concluded that Gummo had failed to provide any authority to support his assertion that the Department's policy violated the Act, and that "in the absence of any allegation that the policy was designed to hinder Reservists from participating in their military duties,"

*id.*, his arguments were insufficient to raise a question of material fact as to the Village's motive for discharging him. Judgment was entered dismissing the action as a matter of law, and this appeal followed.

## II. DISCUSSION

On appeal, Gummo contends principally that the sole-motivation test should not have been applied and that there was sufficient evidence to permit a reasonable juror to find a causal link between his membership in the Reserves and his discharge. We agree.

### A. *The Motivation Requirement Under the VRR Act*

The VRR Act was enacted in 1968. One of its purposes was to encourage noncareer service in the uniformed services by minimizing the disadvantages to civilian careers and employment that could result from such service. *See* S.Rep. No. 1477, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News ("USCCAN") 3421, 3421–22. It provided, *inter alia*, that an employee "shall upon request be granted a leave of absence by such person's employer for the period required to perform ... inactive duty training." 38 U.S.C. § 2024(d) (1988). Prior to 1994, § 2021 of the Act (which was renumbered § 4301 in 1992, and relevant parts of which were renumbered § 4311 in 1994) provided, in pertinent part, that

> [a]ny person who [is employed by the state or a political subdivision thereof] shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

38 U.S.C. § 2021(b)(3) (1988) (renumbered § 4301(b)(3) pursuant to Pub.L. No. 102–568, § 506 (1992); renumbered § 4311 in Pub.L. No. 103–353, § 2 (1994)). In 1981, the "because of any obligation" language of § 2021(b)(3) was interpreted by the Supreme Court as having "the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated solely by reserve status." *Monroe v. Standard Oil Co.*, 452 U.S.

at 559, 101 S.Ct. at 2516. In so stating, the Court relied on the legislative history of that section, including a House of Representatives Committee report which stated that the section

> amplifies existing law to make clear that reservists not on active duty, who have a remaining Reserve obligation, whether acquired voluntarily or involuntarily, will nonetheless not be discriminated against by their employees [*sic*] soley [*sic*] because of such Reserve affiliation.

*Id.* at 558, 101 S.Ct. at 2521 (quoting H.R.Rep. No. 1303, 90th Cong., 2d Sess. 3 (1968) (brackets in *Monroe*)). In *Monroe*, the Supreme Court had ruled that the VRR Act did not require employers to make work-scheduling accommodations for reservists that were not made for other employees, *i.e.*, to provide a reservist with "a special work-scheduling preference." 452 U.S. at 561, 101 S.Ct. at 2517. Following *Monroe*, other courts interpreted § 2021(b)(3) as permitting the exoneration of an employer who could point to a nonpretextual reason for an adverse employment decision that was irrelevant to the employee's military status, even if that status played some role in the decision. *See, e.g., Burkart v. Post–Browning, Inc.*, 859 F.2d 1245, 1247 (6th Cir.1988); *Sawyer v. Swift & Co.*, 836 F.2d 1257, 1262 (10th Cir. 1988); *Clayton v. Blachowske Truck Lines, Inc.*, 640 F.Supp. 172, 174 (D.Minn.1986), *aff'd*, 815 F.2d 1203 (8th Cir.1987).

In 1994, Congress enacted the Uniformed Services Employment and Reemployment Rights Act ("USERRA") to replace the VRR Act in order to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions." H.R.Rep. No. 65, 103d Cong., 2d Sess. 18 (1994) ("House Report" or "Report"), *reprinted in* 1994 USCCAN at 2449, 2451. USERRA was designed to "[c]ontinue to prohibit discrimination or acts of reprisal against an employee ... because of a past, current, or future military obligation," House Report at 17, 1994 USCCAN at 2450, but it eliminated the "because of" language of § 2021(b)(3), and Congress disavowed the sole-motivation requirement inferred by *Monroe* and its progeny. The language was

modified to state that an employer violates the Act if an employee's "membership ... or obligation for service in the uniformed services is *a* motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership ... or obligation." 38 U.S.C. § 4311(b) (emphasis added).

The Village argues that the district court properly applied the *Monroe* sole-motivation test in the present case in preference to the existing language of § 4311(b) because USERRA, which became effective on October 13, 1994, long after the events involving Gummo, did not expressly overrule *Monroe*. Given Congress's power to amend a statute to clarify its original intention when the courts have misperceived that intention, and to make such clarifications applicable to cases begun before passage of the clarifying statute, *see generally Rivers v. Roadway Express, Inc.*, —— U.S. ——, ——, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274 (1994); *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir.1987), and given the congressional descriptions of § 4311(b) discussed below, we disagree.

The report of the House of Representatives Committee on Veterans' Affairs accompanying the House bill that eventually became USERRA stated that "the original intent of Congress when it enacted current section 2021(b)(3) of title 38, in 1968" was not the imposition of a sole-motivation test, House Report at 24, 1994 USCCAN at 2457, and that the cases applying the "sole factor" test suggested by *Monroe* had misinterpreted Congress's intent:

> To the extent that courts have relied on dicta from the Supreme Court's decision in *Monroe v. Standard Oil Co.*, 452 U.S. 549, 559, 101 S.Ct. 2510, 2516, 69 L.Ed.2d 226 (1981), that a violation of this section can occur only if the military obligation is the sole factor (*see Sawyer v. Swift & Co.*, 836 F.2d 1257, 1261 (10th Cir.1988)), those decisions have misinterpreted the original legislative intent and history of 38 U.S.C. § 2021(b)(3) and are rejected on that basis.

House Report at 24, 1994 USCCAN at 2457. The Report stated that the new language of § 4311(b) was "simply a reaffirmation of the

original intent of Congress," House Report at 24, 1994 USCCAN at 2457, "that the standard of proof in a discrimination or retaliation case is the so-called 'but-for' test and that the burden of proof is on the employer, once a prima facie case is established," *id.* The report of the Senate Committee on Veterans' Affairs likewise stated that § 4311's explicit mixed-motive and burden-shifting language simply reflected Congress's original intent:

> New section 4311(b) would provide, *consistent with current law,* that the employer would be considered to have committed a prohibited act of discrimination under the VRR law if the claimant's covered connection with service was *a* motivating factor in the employer's action, *unless the employer showed that the action complained of would have been taken in the absence of service connection. This provision is a reaffirmation of the original intent of Congress when it enacted current section* 4301(b)(3) of title 38 *in 1968.* The Committee intends ... that the burden of proof with respect to this affirmative defense would be on the employer.

S.Rep. No. 158, 103d Cong., 2d Sess. 45 (1994) ("Senate Report") (emphasis added).

Explicitly rejecting *Monroe,* both congressional reports stated that courts applying § 4311(b) should instead use the scheme of burden-of-proof allocations approved by the Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983), for actions under the National Labor Relations Act. House Report at 24, 1994 USCCAN at 2457; Senate Report at 45. Under that scheme, a claimant carries his burden of proving a prima facie case of discrimination by showing, by a preponderance of the evidence, that his protected status was "a substantial or motivating factor in the adverse [employment] action"; but the employer may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status. *Transportation Management,* 462 U.S. at 401, 103 S.Ct. at 2474.

We reject the Village's contention that this analytical scheme was not meant to apply to preexisting cases such as the present case. With respect to § 4311, USERRA states as follows:

> The provisions of section 4311 of title 38, United States Code, as provided in the amendments made by this Act, ... *that are necessary for the implementation of* such section 4311 shall become effective on the date of enactment of this Act.

Pub.L. No. 103–353, § 8(b) (emphasis added). Though this provision is perhaps susceptible to differing interpretations, the legislative history statements, describing § 4311 as simply a reaffirmation of Congress's original intent in enacting § 2021(b)(3), strongly indicate that Congress did not regard the linguistic change as an amendment that is "necessary for the implementation of such section 4311." This was made more plain by a bicameral report with respect to the effective dates on which USERRA's various provisions were to become effective: it was agreed that "the standard and burden of proof set forth in section 4311(b) are not additions to the Act but are a codification of existing law." Joint Explanatory Statement on H.R. 995, 140 Cong.Rec. H 9136 (daily ed. Sept. 13, 1994), *reprinted in* 1994 USCCAN 2493, 2515. Accordingly, the House Report stated expressly that the *Transportation Management*

> standard and burden of proof is [*sic*] applicable to all cases brought under this section *regardless of the date of accrual of the cause of action.*

House Report at 24, 1994 USCCAN at 2457 (emphasis added).

Given Congress's clear statements as to its original intent in enacting the VRR and its wish to have the courts apply § 4311(b) in accordance with that intent to all cases regardless of their vintage, we conclude that the district court should not have employed the sole-motivation analysis adopted by *Monroe* and its progeny. Proper analysis, in connection with the Village's summary judgment motion, required a determination of (a) whether there was sufficient evidence from which a rational jury could infer that Gummo's status or conduct as a reservist was a substantial or motivating factor in his dis-

missal; and (b) if there was such evidence, whether it could be said as a matter of law that the Village would have discharged him even if he had not been a reservist.

### B. *The Record in the Present Case*

A party moving for summary judgment bears the burden of establishing that there exists no genuine issue of material fact warranting a trial, *see, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and that the affidavits and depositions, etc., "show that . . . the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c). In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the non-moving party's claim. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In ruling on such a motion, the district court must view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. *See, e.g., Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper. *See, e.g., Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994); *Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir.1988). In determining whether the nonmoving party has presented evidence sufficient to defeat the motion for summary judgment, we review the record *de novo*, drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party. *See, e.g., Goenaga v. March of Dimes Defects Foundation*, 51 F.3d 14, 18–19 (2d Cir.1995); *Healy v. Rich Products Corp.*, 981 F.2d 68, 72 (2d Cir.1992); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert.* *denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The record in the present case, taken in the light most favorable to Gummo, sufficed to require denial of the Village's motion for summary judgment. First, the evidence permits an inference of hostility on the part of the Department toward reservists *qua* reservists. For example, the Department had previously dealt with another reservist's requests in such a way as to cause the officer to complain to the United States Department of Labor; and when a representative of that federal agency informed Maccarone that the reservist was entitled to enforce the law, Maccarone told the federal official, " 'You're out of your mind' " (Maccarone Dep. at 39), and ordered the official out of Maccarone's office. In addition, at his deposition, Maccarone stated that the Department could not afford to have more than two or three reservists on its staff (*id.* at 33); that he was "bother[ed]" by Gummo's insistence that the Department obey "the letter of the law" (*id.* at 76); and that he was "not going to let [Gummo] ruin the law enforcement in the Village of Depew by not having enough people on duty" (*id.*). In the same month in which he initially rebuked Gummo with respect to his requests for Reserves leave, and, according to Gummo, threatened to "get" Gummo, Maccarone proceeded to complain to a local official about the special treatment accorded to reservists, requesting legislation to end what Maccarone called "double dipping in its most flagrant form." Though requesting legislation is of course valid conduct, the making and the tone of that request nonetheless confirmed Maccarone's antipathy toward the statutory benefits to which reservists were then entitled. A jury could easily infer from this record an anti-reservist animus on the part of the Department.

Further, with respect to the Department's denial of Gummo's June 7 and June 8 requests that he be relieved of his June 8–9 night-shift assignment, which precipitated the chain of events that led directly to his dismissal, a jury could reasonably question the bona fides of the Village's stated rationale for the denial, *i.e.*, that Gummo's requests were not accompanied by his written

orders. Gummo had submitted those written orders to the Department in May. The written orders, which are in the record, stated that Gummo was to report to the Air Force base at 7:30 a.m. on June 9; they authorized him to receive 16 days of leave for military duty (June 9–24); and they authorized him to receive, in addition, one day of leave for travel to the Air Force base. Since the Department had already received the written orders, the denial of Gummo's June 7 and June 8 requests on the ground that he did not submit written orders seems, at best, peculiar.

At oral argument of this appeal, the panel inquired why the previously submitted orders did not meet the requirement imposed by the Department's policy. No satisfactory response was forthcoming. Counsel for the Village repeatedly responded that the orders set a starting date of June 9 and that Gummo's shift was for June 8. This explanation too seems peculiar in light of the facts that that June 8–9 night-shift was scheduled to end at 7:00 a.m. on June 9, and that the written orders already submitted to the Department stated that Gummo's annual tour was to commence at 7:30 a.m. on June 9 and that he was to be allowed a day of leave for travel.

From the fact that Gummo had already submitted the written orders that the Department continued to demand, from the absence of any plausible explanation as to why that submission did not suffice to satisfy the Department's policy, from the Village's seemingly irrational position that the Department could not fathom that a shift ending at 7:00 a.m. on June 9 did not give Gummo a day for travel to an assignment that was to begin 30 minutes later, and from the many manifestations of the Department's antipathy toward reservists' enforcement of their statutory rights, a jury could reasonably infer that the Department's denial of Gummo's leave request on the ground that it was not accompanied by the written orders was pretextual, and that that stance and Maccarone's confrontations with Gummo were intended, because of Gummo's insistence on his rights as a reservist, to lead to the termination of his employment.

In sum, we conclude that the evidence in the record, taken in the light most favorable to Gummo, sufficed to establish a prima facie case under § 4311(b) and to preclude a ruling as a matter of law that the Village would have discharged him even if he had not been a reservist. Accordingly, summary judgment dismissing the complaint was inappropriate. We of course express no view as to the likely outcome of the case after a trial.

C. *Gummo's Cross–Motion for Partial Summary Judgment in his Favor*

■ Gummo also pursues on appeal his contention that he is entitled to partial summary judgment declaring that the Department's policy of not granting leave without the reservist's presentation of written orders violated the VRR Act. In support of this contention, he points to a provision in a United States Department of Labor Handbook. We are not persuaded.

The paragraph on which Gummo relies states as follows:

The request for leave does not have to be in writing or in any particular form, although a written request may facilitate proof of eligibility and prevent possible misunderstandings. *Furnishing the employer with a copy of the schedule of training drills in advance could facilitate the employer's own work scheduling, but this is not always possible and is not required by law.* The law does not specify when the request shall be made, nor does it set any limit on the time that may elapse between leaving the position and actually commencing the training duty. At a minimum, the employer must allow the employee sufficient time to arrive at his training site, even if it means leaving work early. Misunderstandings may be prevented if the employer is given sufficient advance notice to plan work schedules so as to minimize any inconvenience resulting from the reservist's absence.

Department of Labor, *Veterans' Reemployment Rights Handbook*, 18–2 to 18–3 (1988) (emphasis added). The Handbook, which itself acknowledges that it does not have the force of law, *see id.* at 1, appears principally to interpret the requirements imposed by the

Act. The statement that furnishing the employer with written orders "is not required by law" is not the equivalent of a statement that such a requirement by the employer violates the law. The Act provided that the reservist must be given a leave of absence to perform such inactive-training duty as was "required." 38 U.S.C. § 2024(d) (1988). To the extent that it is possible for an employee to furnish his written orders, the employer's requirement that he do so would appear to seek a reasonable form of proof that is not prohibited by the Act and that is consistent with the tenor of the Handbook. If furnishing such orders were impossible, insistence on compliance with such a requirement could be unreasonable. But the present case is not one in which it was impossible for the reservist to furnish his written orders; indeed, as discussed above, those orders had been furnished. We conclude that Gummo's cross-motion for summary judgment was properly denied.

## CONCLUSION

We have considered all of the Village's arguments in support of summary judgment in its favor and have found them to be without merit. The judgment of the district court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

Costs of the appeal to plaintiff.

MILTON POLLACK, Senior District Judge, dissenting.

I respectfully dissent.

This case involves the discharge for insubordination, lying and obstreperous conduct of a Village policeman ("appellant"), who was also a Reservist in the United States Air Force. The discharge was based on the recommendation of an impartial Hearing Officer who, after a two day hearing, found the policeman guilty of three current violations of the Department's Rules of Conduct and a

history of improprieties as a police officer, involving reprimands and a suspension for misconduct. The Hearing Officer found that (i) the policeman had been disciplined for violations of the Department's rules on several prior occasions [1]; (ii) rehabilitation was no longer a reasonable prospect and (iii) the policeman had demonstrated an unwillingness and inability to work under the authority of his superior officer. The Village Board thereupon unanimously voted to adopt the Hearing Officer's recommendation and terminated the plaintiff. There is no evidence that the parties who authorized the discharge, the Hearing Officer and the Village Board, harbored or acted upon any animus with respect to the policeman's status as a Reservist.

Following his discharge, the appellant instituted a suit for state court relief. That challenge was not perfected and was then abandoned. Three years later, in 1993, he commenced this suit alleging herein that his disciplinary history, suspensions and departmental altercations were motivated by his "status and duty as a member of the armed forces". He principally sought reinstatement and compensation for lost wages and other lost benefits.

The Village responded that it had terminated his employment only because of his insubordination and demonstrated repetitive misconduct as a police officer.

Appellant sued herein under the Veterans' Reemployment Rights Act, 38 U.S.C. § 2021, et seq., a statute enacted in 1968 which the Supreme Court interpreted in *Monroe v. Standard Oil Company*, 452 U.S. 549, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981), to require that the plaintiff prove he was discriminatorily discharged by an employer "motivated solely by [his] Reserve status". *Id.* at 559, 101 S.Ct. at 2516. This interpretation, according to the 1994 Reports of the Congressional Veterans' Committees, misconstrued the intent of the 1968 Congress in enacting the law.[2] Citing these Reports, the majority

---

**1.** Within the two years preceding his discharge, the police officer had received reprimands for misconduct towards his Shift Lieutenant and for disseminating information to the public without proper authorization. He had also been found guilty of seven counts of misconduct and sus-

pended for 30 days following an argument with his superior officer.

**2.** The "mistaken" interpretation of the applicable statute by the Supreme Court was followed by

opinion of this Court concludes that the *Monroe* test does not apply to this case and substitutes in its place the new and supposedly retroactive "but for" standard enunciated in the Uniformed Services Employment and Reemployment Rights Act ("USERRA") [38 U.S.C. § 4301, et seq. (1994) ]. This "but for" standard means that it is for the employer to establish that the discharge would have occurred even if the employee were not a member of the Reserves.

In support of the theory of a "mistaken" interpretation, the majority's Opinion cites the Report of the 1994 House Committee on Veterans' Affairs accompanying the 1994 House Bill that eventually became USERRA. In this Report, the House Committee contended that the original intent of the 1968 Congress was not the imposition of a sole motivation test to be established *prima facie* by the veteran. The majority Opinion further cites the Report of the 1994 Senate Committee on Veterans' Affairs, which included a statement, contrary to *Monroe*, that the 1994 version was merely a "reaffirmation" of the original intent of the 1968 Congress (not so expressed by the then Veterans' Committees or included in the statute itself) placing the burden of proof with respect to the affirmative defense on the employer.

In order for the 1994 revised statute to have been made applicable to pending cases such as this, the new statute would have to have said so; a congressional committee's expression of intent in these reports does not suffice to add what does not appear in the enactment:

A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction ... Congress, of course, has the power to amend a statute that it believes we have

misconstrued.... No such change, however, has the force of law unless it is implemented through legislation. Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the "corrective" amendment must clearly appear.

*Rivers and Davison v. Roadway Express, Inc.,* —— U.S. ——, ——, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274 (1994). No such implementation is clearly apparent within the text of USERRA. In fact, the only relevant language in the statute indicates an intent that the provisions of the new statute become effective on October 13, 1994 and makes no mention of retroactivity:

The provisions of section 4311 of title 38, United States Code, as provided in the amendments made by this Act, ... that are necessary for the implementation of such section 4311 shall become effective on the date of enactment of this Act.

Pub.L. No. 103–353, § 8(b). The majority asserts that "this provision is perhaps susceptible to differing interpretations" and offers its own interpretation: that the "codification" of the "but for" test was not one of the provisions necessary for the implementation of § 4311 and that this provision is therefore not effective on the date of enactment of the Act but at some earlier date. Although this interpretation may allow the majority narrowly to escape from the presumption that the new statute applies only from its enactment date, it certainly does not provide any clear indication of intended retroactive application.[3]

Furthermore, the legislative history cited by the majority does not indicate clearly that the "but for" test applies retroactively:

identical interpretations by the 6th, 8th and 10th Circuits.

**3.** In fact, the only other discussion of an effective date in the statute confirms that no retroactive application was intended:

(a) Reemployment—(1) ... the amendments made by this Act shall be effective with respect to employments initiated on or after the first

day after the 60–day period beginning on the date of enactment of this Act [Oct. 13, 1994]. (2) The provisions of chapter 43 of title 38, United States Code, in effect on the day before such date of enactment, *shall continue to apply to reemployments initiated before the end of such 60–day period.*
*See* Historical and Statutory Notes, 43 U.S.C. § 4301 (citing § 8 of Pub.L. 103–353) (emphasis added) (citations omitted).

[this] standard and burden of proof is [*sic*] applicable to all cases brought under this section regardless of the date of accrual of the cause of action.

H.R.Rep. No. 65, 103d Cong., 2d Sess. 18 (1994). It is not specified whether the phrase "brought under this section" applies to cases "brought" in the future or also to cases that "have been brought" in the past. Nor is it clear that this language has any relevance to a prior version of "this section," which included significantly different language.

The existence of these questions indicates that although the 1994 Congressional Committees may have intended to overturn *Monroe* and to make the consequences of this change retroactive, Congress failed clearly to manifest any such intent within the statute. In *Rivers,* the United States Supreme Court concluded that a similar failure was fatal to the cause of retroactivity under § 101 of the Civil Rights Act of 1991:

> We may assume, as petitioners argue, that § 101 reflects congressional disapproval of *Patterson's* interpretation of § 1981. We may even assume that many or even most legislators believed that *Patterson* [*v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) ] was not only incorrectly decided but also represented a departure from the previously prevailing understanding of the reach of § 1981. Those assumptions would readily explain *why Congress might have wanted to legislate retroactively,* thereby providing relief for the persons it believed had been wrongfully denied a § 1981 remedy. Even on those assumptions, however, *we cannot find in the 1991 Act any clear expression of congressional intent* to reach cases that arose before its enactment.... The text of the Act does not support the argument that § 101 of the 1991 Act was intended to "restore" prior understandings of § 1981 as to cases arising before the 1991 Act's passage.

*Rivers,* —— U.S. at ——, 114 S.Ct. at 1516 (emphasis added). Thus, Congress's failure unequivocally to state that USERRA applies to cases brought before the law's effective date signifies that a "sole motivation" test should be applied to cases, such as the present one, which were brought prior to October 13, 1994.

Under this "sole motivation" test, it is the plaintiff who is required to provide sufficient admissible, relevant evidence permitting the court below to conclude that his discharge was not motivated by insubordination or dishonesty, but instead solely because he was a Reservist. *See Clayton v. Blachowske Truck Lines, Inc.,* 640 F.Supp. 172, 174 (D.Minn. 1986), *aff'd,* 815 F.2d 1203 (8th Cir.1987) (to avoid summary judgment, plaintiff must provide "evidence which raises an inference that his reserve status was the sole motivation behind his termination").

Summary judgment is appropriate in this case because there is no evidence before the Court that the plaintiff's Reservist status was a determinative factor in the decision to terminate his employment, much less the sole factor. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In the majority's unavailing search for such evidence, the majority contends that the Department provided no satisfactory response as to why the policeman's previously submitted military orders did not meet the requirements of the Department's notification policy. However, the dispute over orders, which directly preceded the discharge, was based not only on the officer's failure to submit an order permitting the travel day, but also on the officer's delay in actually requesting the travel day:

> [e]ven though Gummo had waited until the very last moment to ask for the day off, *the Chief did not deny his request* and, according to Zolnowski, when Gummo advised the Chief, the afternoon of June 8th, that he had contacted the base that morning to arrange for a letter granting him the day off but he didn't know when it would arrive, *the Chief replied that he would abide by it and accept it even if it came in after Officer Gummo had left* (T.253), certainly not the reaction one would expect of someone who was out to "get" the officer. I cannot find one instance during the events which transpired in [sic] regard to the instant situation, in which the Chief

could be viewed as provoking Officer Gummo.[4]

(Hearing Officer's Recommendation at 52; A. 77) (emphasis added). Furthermore, the Department's request for additional proof of the necessity of a travel day does not excuse the officer's subsequent intemperate insubordination and lack of honesty. The police officer's unprofessional response was certainly sufficient "straw to break the camel's back", given the officer's past record of insubordination and his earlier *undisputed* violation of the Department's leave policy, for which he was suspended thirty days.

Given the substantial evidence supporting the existence of a non-pretextual reason for discharge, the entire absence of any evidence that the Village Board and the impartial Hearing Officer were motivated by hostility towards Reservists, *qua* Reservists, and the absence of evidence indicating Reservist discrimination at any time, we ought not interfere with the right of the Village to discipline its police officers for personal misconduct. The Village openly gave the appellant an unbiased independent review of all of his official conduct before an impartial Hearing Officer who conducted the administrative proceeding. Due process was all that was required. It is indisputable on this record that appellant's Reservist status was not the cause of his discharge, whichever statute applies. Neither statute permits an employee to exploit his status as a Reservist in order to shield himself from the consequences of his misconduct. *See Britt v. Georgia Power Company,* 677 F.Supp. 1169 (N.D.Ga.1987); *McCormick v. Carnett–Partsnett Systems, Inc.,* 396 F.Supp. 251, 256 (M.D.Fla.1975).

I would affirm.

---

**4.** The lengthy analysis in the majority opinion indirectly impugning the *bona fides* of the Village's stated rationale for the so-called "denial" of requests that Gummo be relieved of submitting an order permitting the travel day is at odds with the explicit finding of the report of the Hearing Officer. Counsel's responses to questions regarding this "denial" at our oral hearing appear to have overlooked the content of the administrative record.