**Kevin KEY, Plaintiff,**

v.

**HEARST CORPORATION and Hearst Magazine Division, Defendants.**

**No. 95 Civ. 10454(DC).**

United States District Court,
S.D. New York.

May 5, 1997.

Eileen H. Persky, North Bergen, NJ, for Plaintiff.

Paul, Hastings, Janofsky, & Walker, L.L.P. by Alfred G. Feliu, Ann T. Kenny, New York City, for Defendants.

### MEMORANDUM DECISION

CHIN, District Judge.

Plaintiff Kevin Key ("Key") alleges that his dismissal by defendants Hearst Corporation and Hearst Magazine Division (together "Hearst") upon his return from military leave violated the Veterans' Reemployment Rights Act ("VRRA"), 38 U.S.C. §§ 4301(b)(1) and 4303(d).[1] Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons that follow, the motion is granted and the complaint is dismissed in all respects.

### BACKGROUND

Key, an African–American male, was hired as an Assistant Advertising Coordinator for Hearst's *Country Living* magazine in July 1989. (Pl.Dep.6, 9, 11, 17).[2] Key joined the National Guard Reserves in 1991. (Pl. Dep.73). Accordingly, Key was required to train for 13 weeks as well as to perform reserve duty two weeks a year and one weekend per month. (Pl.Dep.73–74). Key's department head at the time, Allan Bittner, replied "Okay, fine" when notified of Key's military commitment. (Pl.Dep.75). Other Hearst employees, including Key's subsequent supervisor, Susan Gon ("Gon"), congratulated Key. (Gon Dep. 114–15, Alfred G. Feliu Aff. Ex. E.). Hearst hired a temporary employee to fill in for Key during Key's 13–week training leave. (Pl.Dep.76). Key

took a one-week vacation upon completing his training in September 1991. (Pl.Dep.73–74).

In July 1992, Key applied for, and was granted, a transfer to a different Hearst magazine, *Colonial Homes*. (Pl.Dep.22–23). Key asked Josephine Duryea ("Duryea"), the Group Manager for *Colonial Homes*, to consider him for the position because he was "unhappy" at *Country Living*. (Pl. Dep. 25; Duryea Dep. 60–61, Alfred G. Feliu Aff. Ex. F). Key stated that he was having problems with his supervisor at *Country Living*, Jean-Marie Hayes. (Pl. Dep. 25; Duryea Dep. 60–61). Duryea stated that she was "happy to have him" join her team. (Pl.Dep.25). Consequently, Duryea recommended Key to Gon, the supervisor at *Colonial Homes*. (*Id.*). Gon authorized the transfer and met with Key to discuss the responsibilities of the Assistant Advertising Coordinator position at *Colonial Homes*. (Pl.Dep.25–26).

Three weeks after Key began working at *Colonial Homes*, Key took a two-week military leave from August 8–22, 1992, which Gon had authorized in late July. (Pl.Dep.78–79). Following his military leave, Key took a one-week vacation. (Pl.Dep.79).

Soon thereafter, Key asked Duryea to consider him for the Advertising Coordinator position at another Hearst magazine, *Esquire*. (Pl. Dep. 33; Duryea Dep. 58; Gon Dep. 80). The Advertising Coordinator position would have been a promotion for plaintiff. (Pl.Dep.32–34, 131–32, 168, 228–29). Key sought the position because it was a "challenge" and he would no longer need to "try[ ] to look busy." (Pl.Dep.34). Duryea recommended Key for the position at *Esquire* to Gon who, in turn, hired Key, with a pay raise. (Pl. Dep. 34–35; Gon Dep. 80).

---

1. Plaintiff originally filed this action against defendant for breach of contract, a state military law claim, and alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* 42 U.S.C. § 1981 and the VRRA, 38 U.S.C. §§ 4301(b)(3) and 4304(d). Plaintiff withdrew the breach of contract and state military law claim in plaintiff's second amended complaint. In plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, plaintiff has stipulated to the withdrawal with preju-

dice of his Title VII and Section 1981 claims. Plaintiff now proceeds solely under the VRRA claim.

2. "Dep." refers to the transcript of the deposition taken of the person named therein. "Pl. Dep." refers to the deposition taken of the plaintiff, Kevin Key, attached to the Alfred G. Feliu Aff. Ex. C.

In September 1992, Key began working for *Esquire* and reported directly to *Esquire's* Group Manager, Duryea. (Pl. Dep. 35; Duryea Dep. 12–13). Key's responsibilities included meeting with managers and sales representatives, maintaining the advertising information system, entering advertising orders into the computer, preparing reports and processing billing information and invoices. (Pl.Dep.37, 39–40, 50–56). Duryea testified that the work had to be done on a timely basis. (Duryea Dep. 62). Moreover, the workers in the Advertising Information Services ("AIS") Department, including Key, were required to be at work by 9:00 a.m. to be available to assist the manager. (Duryea Dep. 94). Duryea, however, allowed Key and her other direct employees to arrive to work occasionally by 9:10 a.m. (Duryea Dep. 82–83).

By November 1992, however, Key failed twice to appear for work; he did not inform Duryea of his absence on those occasions. (Duryea Dep. 74–6, 88). Consequently, Duryea drafted a memorandum dated November 16, 1992 ("November Notice") reminding Key of proper working hours and instructing Key to call by 9:00 a.m. if he was to be absent that day. (Calitri Aff. Ex. 1). The November Notice also stated that Key had a problem getting information to sales representatives on time and requested that Key not delegate work to others without first going to Duryea. (*Id.*). For example, Peter Fisher ("Fisher"), a sales representative, complained to Duryea that Key had failed to respond for three weeks to Fisher's request for account information. (Calitri Aff. Ex. 1; Duryea Dep. 126). Although Duryea testified that she placed the November Notice on

Key's desk (Duryea Dep. 90–91), Key testified that he never received the notice. (Pl. Dep.97).

On December 3, 1992, Duryea informed Gon that she, along with the credit department and sales representatives, was having problems with Key's performance. (Duryea Dep. 121–24). Consequently, Gon held a counseling session with Duryea and Key, while also reprimanding Key for a shouting confrontation with Duryea. (Gon Dep. 144; Duryea Dep. 135–36). Gon's memorandum ("December Memorandum") of the meeting confirmed that it was "expressed to you and clearly understood that your tardiness and indifference towards Josephine [Duryea]'s supervision of you and your position will not be condoned." (Calitri Aff. Ex. 3). The December Memorandum requested that Key arrive to work on time and follow Duryea's direction without constant challenge. (*Id.*).

In February 1993, because Key's reserve unit was being closed, his military duties were accelerated. This required Key to go out on military leave for an entire week in each of March, April and May 1993 rather than one weekend a month. Duryea testified that she believed that Key would be obligated to go out on military leave for one week "[e]very month for the foreseeable future"[3] as opposed to the next three months. (Duryea Dep. 92).

In a March 1993 memorandum ("March Memorandum") to Gon, Duryea listed the problems that she encountered while performing Key's work during his military leave from March 1–5. (Calitri Aff. Ex. 4). Duryea noted that 32 orders were left unprocessed,[4] the April 1993 closing reports had

---

3. Duryea was asked, "At some point, did you learn that Mr. Key would be obligated to go out on military leave for one week?" In the original transcript of Duryea's deposition, Duryea replies, "Every month for the foreseeable future." On the errata sheet for the deposition (Alfred G. Feliu Aff. Ex. F, Ex. A), Duryea replaced the phrase "[e]very month for the foreseeable future" with the word "Yes." Plaintiff contests this change in the deposition testimony. Looking at the facts in the light most favorable to the plaintiff, the Court will use the original answer for purposes of summary judgment here.

4. Key testified that he left Duryea a note about several unprocessed orders that came late on the

day before his leave. (Pl.Dep.157). He testified that Duryea was aware of the unprocessed orders and told him to "[l]eave the stack" for her to "take care of … first thing Monday morning." (Pl.Dep.157). Nonetheless, Duryea testified that no more than twenty orders come in during a normal week. (Duryea Dep. 121).

Alternatively, Key contends that Hearst's inability to produce more than 21 orders out of the 32 cited implies Hearst's bad faith in accusing Key of untimely work performance. (Pl. Mem. at 4). According to Hearst, however, it was not feasible as of 1995 to retrieve all 32 orders, some of which may have been verified but not entered into the system, as it would have required re-

not been distributed, and several sales representatives had complained that Key had charged the wrong rates on customer invoices, even after the customers had informed Key of the appropriate rates. (*Id.*). Duryea also stated that others in the Credit Department complained about the length of time it took for Key to adjust invoices or to clear a particular problem. (*Id.*). Duryea testified that although she had informed Key of the incorrect invoices on three or four occasions, the problems persisted. (Duryea Dep. 126).

Furthermore, Duryea stated in the March Memorandum that Key yelled at her on several occasions, telling her that he "[didn't] want to hear it" when reminded of proper working hours. (Calitri Aff. Ex. 4). Duryea noted that Key's attitude had not improved since the December meeting because he was still extremely rude to her. (*Id.*) Duryea concluded that although Key was "very capable" of performing the duties of an Advertising Coordinator, he worked inefficiently and "does what he wants when he wants to." (*Id.*)

On March 12, 1993, Gon issued a Final Written Warning to Key ("Final Warning"). (Calitri Aff. Ex. 5). Initially, Gon stated that Key's performance problems would not be tolerated, that he was to be in to work by 9:00 A.M., and that he was not to leave the office for personal reasons unless preapproved. (*Id.*). Gon concluded that unless Key demonstrated significant improvement in overall performance over the next 30 days, his employment would be terminated. (*Id.*). The last week of the 30–day Final Warning period overlapped with Key's military leave from April 5–9.

In a memorandum dated April 8, 1993 ("April Review") while Key was on military leave, Duryea noted that Key's performance during the Final Warning period had improved in several areas. (Calitri Aff. Ex. 7). For example, Key notified Duryea when he would be away from his desk, processed insertion orders and reports on time, and acted in a slightly more professional manner. (*Id.*). Nonetheless, Duryea also noted that Key regularly arrived past 9:00 a.m. on the days he worked,[5] processed insertion orders inaccurately, had to be constantly reminded to perform follow-up assignments, and did not focus his attention on the work. (*Id.*). Duryea concluded that Key was not processing his work efficiently and accurately. (*Id.*).

Consequently, Duryea testified that although she was willing to retain Key as Advertising Coordinator, Key's performance did not sufficiently improve as of the end of the Final Warning period to merit retention. (Duryea Dep. 157–58, 163). Duryea testified that Key's termination was warranted because "[Key]'s work had not improved and his attitude was very hostile ... at this point, the magazine was complaining all the time about his work." (Duryea Dep. 172). Gon and Duryea consulted with the Director of Human Resources and notified Key when he returned from military leave that his employment was being terminated. (Pl. Dep. 81–82, 220–21; Gon Dep. 117, 135).

Key initially received unemployment benefits because Hearst did not establish that Key's discharge was due to "excessive" tardiness. A year later, Hearst successfully challenged Key's eligibility by a default judgment, requiring Key to pay back all the benefits he had received.

Key claims that while he knew of no other employee whom Hearst discriminated against because of his or her military status, Key was the only Hearst employee in the AIS department to be disciplined and discharged

---

viewing all of Hearst's files for all active advertisers in 1993. (Def. Reply Mem. at 14). Even assuming that Duryea was aware of a stack of 21, not 32, unprocessed orders, a reasonable jury could only conclude that Key had left unprocessed a considerable number of orders prior to the receipt of last-minute orders on the day before his military leave.

5. Key reportedly arrived to work between 9:05 a.m. and 9:45 a.m. on ten out of fourteen work days during the 30–day Final Warning period. Key arrived to work "before nine" on two days and at 9:00 a.m. and 9:45 a.m. on the other two days. (Eileen H. Persky Aff. Ex. 6). Key testified, however, that he generally arrived to work earlier than 9:00 a.m., worked through his lunch hour and late in the evenings to keep up with the demands of *Esquire*, "not because [he had] to, but because [he wanted] to." (Pl.Dep. 161).

on the grounds of tardiness or performance problems. (Pl. Dep. 124–25; Pl. Mem. at 6). Key cites to two female, non-military Hearst employees, Donna Ferraro ("Ferraro") and Janet Rosario ("Rosario"), who exhibited tardiness and performance problems. (*Id.*). Key claims that Hearst did not discipline Ferraro or Rosario until Hearst learned of Key's intent to sue for discrimination. (Pl. Mem. at 6–7). However, Janice Calitri, Gon's supervisor, testified that Key's tardiness was the most excessive. (Calitri Dep. 40).

Donna Ferraro's supervisor, Hilda Ortiz, began reporting in July 1993 that Ferraro was arriving late to work and took an inordinate number of sick days. An independent medical examination verified that Ferraro had an obsessive-compulsive disorder that resulted in her inability to arrive to work by 9:00 a.m. Hearst accommodated Ferraro by allowing her to arrive at work up to 9:30 a.m. and, later, to 10 a.m. Nevertheless, Ferraro's continued tardiness and absenteeism rendered Ferraro unproductive at work despite accommodations, meetings, and warnings. Hearst finally terminated Ferraro's employment in February 1994 on the grounds of tardiness. However, because Ferraro was still in therapy to control her disabilities, the New York State Department of Labor ("NYS Labor Dept.") determined that Ferraro's latenesses were not caused by deliberate misconduct. Consequently, the NYS Labor Dept. granted unemployment benefits to Ferraro.

As for Janet Rosario, Gon met with Rosario in July 1993 to address Rosario's tardiness and absenteeism. Rosario, like the plaintiff Key, was an Advertising Coordinator under Gon's ultimate supervision. Rosario eventually corrected her tardiness problem by arriving to work before or at 9:00 a.m. and remains a Hearst employee.

Both Duryea and Gon testified that they did not have a problem with Key's military obligations. (Duryea Dep. 93, 142; Gon Dep. 113).

## DISCUSSION

### A. Standard for Summary Judgment

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510–11.

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. As the Court held in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted); *see generally Celotex v. Catrett*, 477 U.S. 317, 322–26, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

### B. The Veterans' Reemployment Rights Act

Section 2021(b) (3) of the VRRA [6] provides that "any person who seeks or holds a posi-

---

6. In 1992, §§ 2021 to 2027 of Title 38 were renumbered §§ 4301 to 4307. In 1994, the VRRA was replaced by the Uniformed Services Employment and Reemployment Rights Act ("the USERRA"). However, plaintiff's claims are governed by the VRRA because the action at issue occurred prior to the enactment of USERRA, which took effect on October 13, 1994. *See* 38 U.S.C. §§ 4301, 4304.

tion described in ... this section shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces." 38 U.S.C. § 2021(b)(3). In determining whether summary judgment is appropriate in a VRRA case, courts apply the three-part burden-shifting analysis first set forth for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See Gummo v. Village of Depew*, 75 F.3d 98, 106 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996) (affirming use of burden-shifting scheme whereby claimant establishes prima facie case of discrimination and defendant demonstrates that claimant's employment would have been terminated regardless of claimant's military status); *see also Sawyer v. Swift & Co.*, 836 F.2d 1257, 1262 (10th Cir.1988) (applying three-step *McDonnell Douglas* analysis to VRRA claim).

Under the *McDonnell Douglas* test, plaintiff has the initial burden of establishing a prima facie case of unlawful discrimination. If that burden is met, defendant then must offer a legitimate, non-discriminatory reason for plaintiff's discharge, at which point the plaintiff must prove by a preponderance of evidence that the proffered reason is pretextual, that it is, in reality, a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993)).

## C. *Plaintiff's Showing of Prima Facie Discrimination*

■ To establish a prima facie case under the VRRA, plaintiff must demonstrate that: (i) he is a member of a protected class, (ii) qualified for the position, (iii) who was sub-

jected to an adverse employment decision, (iv) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. In essence, the plaintiff must demonstrate, by a preponderance of the evidence, that his protected status was "a substantial or motivating factor in the adverse [employment] action."[7] *Gummo v. Village of Depew*, 75 F.3d 98, 106 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996).

For purposes of this motion, I will assume that plaintiff has demonstrated a prima facie case of discrimination based on plaintiff's protected status as a military reservist. The burden then shifts to defendant to articulate a legitimate, non-discriminatory reason for terminating plaintiff's employment.

## D. *Defendant's Showing of Legitimate Non–Discriminatory Reason*

■ Defendants have offered evidence of plaintiff's tardiness, poor work performance, and attitude problems as grounds for dismissing plaintiff. Hence, defendant has articulated an appropriate and justifiable basis for terminating plaintiff's employment.

The record shows that Key's supervisor, individual salespersons, and managers lodged numerous complaints against Key during the course of Key's employment with Hearst, as well as during Key's Final Warning Period. These complaints included Key's inability to clear particular problems or get information to sales representatives on time (in one instance for three weeks); the charging of wrong invoice rates despite being told specifically of the correct rates; and persistent tardiness, including arriving to work past 9:00 a.m. on the majority of working days during the Final Warning Period.

Furthermore, Key was made aware of these complaints through verbal warnings,

---

7. The Supreme Court has stated that the purpose of § 2021(b)(3) is to "protect[] the employee-reservist against discriminations like discharge and demotion, motivated solely by reserve status." *Monroe v. Standard Oil Co.*, 452 U.S. 549, 559, 101 S.Ct. 2510, 2516, 69 L.Ed.2d 226 (1981). It should be noted, however, that the "motivated *solely* by reserve status" standard stated in *Monroe* has been rejected in favor of the

"*a* motivating factor" test set forth in § 4311(b) of the USERRA. (emphasis added). Under this test, the plaintiff need only show that discrimination was a motivating factor in making an employment decision. As of October 13, 1994, this section became applicable to all causes of action, regardless of when they were brought. *See Gummo v. Village of Depew*, 75 F.3d 98, 106 (2d Cir.1996) (citations omitted).

the December Memorandum and meeting, the March Memorandum, and the Final Written Warning issued in March 1993. Because of Key's inability or unwillingness to improve the quality of his performance notwithstanding Key's knowledge of these problems, Key was no longer a productive employee for Hearst. Therefore, Hearst has demonstrated a sufficient justification for terminating Key's employment.

### E. The Evidence of Pretext

■ Once defendants have shown a legitimate, non-discriminatory reason for their decision to terminate plaintiff's employment, the burden shifts to plaintiff to demonstrate that this proffered reason is pretextual. Plaintiff must satisfy this burden by "produc[ing] not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge.'" *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (*quoting Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir. 1994)). Here, Key has failed to demonstrate the existence of a genuine issue of fact as to the issue of pretext.

First, a reasonable jury could only conclude that Key's work performance was subpar. In the face of defendants' proffered evidence establishing a litany of independent complaints against Key, Key has presented no evidence to show that he performed at an otherwise consistent and efficient level. Key's failure to submit a sworn affidavit denying the alleged performance and tardiness problems as well as lack of substantive contrary deposition testimony is telling. In fact, in his deposition, Key does not deny that he arrived late to work or that his work was being inefficiently processed, but contends only that other employees were not being scrutinized in the same manner. (Pl.Dep. 231). Therefore, Key has not presented "sufficient evidence to support a rational finding" that his poor work performance and tardiness were not the real reason for his discharge. *Van Zant,* 80 F.3d at 714; *See McLee v. Chrysler Corp.,* 109 F.3d 130, 136–37 (2d Cir.1997) (stating that because record

forecloses any inference that plaintiff's job performance was satisfactory, and given sequence of events that plaintiff himself did not dispute, no evidence exists from which trier of fact could rationally infer that plaintiff's allegations of discrimination played any part in defendant's decision to fire plaintiff).

Second, plaintiff has attempted to conjure up the specter of discrimination by offering purportedly military-based comments and the purported dismissals of other non-military employees as part of a scheme by defendants to terminate plaintiff's employment. However, plaintiff relies only on speculation and surmise to support his conclusions. Key offers Duryea's sole statement made during her deposition that she believed that Key would have to go on military leave "[e]very month for the foreseeable future" to infer Duryea's possible bias against Key's military status. Key also cites to 11 missing orders to suggest Duryea's bad faith in accusing Key of having neglected his duties to process 32 orders. In addition, Key implies that the termination of his employment immediately upon his return from accelerated military leave imputes to Hearst an invidious motivation for Key's discharge. These speculative assertions do not, however, raise a genuine issue of material fact as to the question of pretext. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 19 (2d Cir.1995) (speculative assertions on matters as to which plaintiff has no knowledge or evidence are insufficient to defeat summary judgment).

On the contrary, the record demonstrates that Hearst accommodated Key in every way regarding his military obligations. Hearst granted every military leave requested, hired a temporary employee to perform Key's duties while Key was on military leave, and promoted Key to the position of Advertising Coordinator with full knowledge of Key's military obligations. Moreover, neither Duryea nor Gon had expressed concerns regarding Key's absences due to his military obligations, only having expressed concerns about problems regarding Key's work performance and tardiness.

■ Finally, plaintiff has not offered sufficient evidence to demonstrate that other similarly-situated non-military employees— Ferraro and Rosario—had committed acts

of comparable seriousness as plaintiff and yet were not disciplined by Hearst. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825 (stating that such demonstration is relevant to inquiry on pretext). In fact, the record shows that Ferraro's and Rosario's situations were easily distinguishable from Key's. Hearst accommodated Ferraro's tardiness because independent physicians verified a medical condition that interfered with her ability to arrive for work on time. Furthermore, Rosario, unlike Key, corrected her tardiness problems once she was given a warning. Therefore, on this record no reasonable jury could find that Key's tardiness and performance problems were a pretext for unlawful discrimination based on plaintiff's military status.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court shall enter judgment in favor of defendants dismissing the second amended complaint, with prejudice and with costs.

SO ORDERED.