Lawrence C. BRITT

v.

GEORGIA POWER COMPANY.

Civ. No. C87–376A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 30, 1987.

Robert S. Giolito, Debra E. Schwartz, Stanford Fagan & Giolito, Atlanta, Ga., for plaintiff.

Michael C. Murphy, Christopher Sheridan Miller, Troutman, Sanders Lockerman & Ashmore, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This action alleging discrimination under the Vietnam Era Veterans' Readjustment Assistance Act is before the court on a motion for summary judgment by defendant Georgia Power Company.

Plaintiff Lawrence Britt filed a three count complaint against defendant, Georgia Power Company, in February 1987. Count one alleges a violation under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2021(a) *et seq.* Count two alleges a claim under an analogous Georgia statute. In count three Plaintiff alleges a claim of intentional infliction of emotional distress. Plaintiff is seeking reinstatement, back pay, compensatory damages for mental pain and suffering, and punitive damages.

Plaintiff was employed by Georgia Power in 1975 as a communications technician. Prior to his employment with Georgia Power, Britt had been a member of the United States Marines. In August 1976, Britt transferred from the Georgia Power's general office to the Athens division. While in Athens, Britt joined the United States Naval Reserves. He remained in Athens until April 1978, when he transferred to the company's Plant Yates, a coal-fuel electric generating facility near Newnan, Georgia. There he was employed as an instrument and control ("I & C") technician. As an I & C technician, Britt was responsible for the maintenance and repair of numerous controls, instruments and gauges used in the operation of two of Plant Yates' units. In April 1979, he was promoted to senior instrument technician. He remained at this position until August 1986, when he was discharged for insubordination.

While employed at Yates, Britt's schedule required that he work several weekends each month, as did every I & C technician. As a member of the U.S. Naval Reserves, he was required to drill with his

reserve unit one weekend per month, and serve two weeks of annual duty per year. From 1977 until approximately January 1985, Plaintiff would swap shifts with a co-worker in order to be free on the weekends when he needed to drill with his reserve unit. Thus, the burden was on Britt to make the arrangements for a swap, and to make sure that his shift was covered.

In February 1985, Britt saw a notice posted on a company bulletin board which indicated that reservists could fulfill their military obligations by swapping shifts, taking unpaid leave, or using paid vacation time. Based on this notice, Britt decided to use vacation days in order to fulfill his weekend military obligations, rather than arranging a swap every month. As a result, he shifted the burden of finding a replacement for himself back to the company. According to Plaintiff, Britt's immediate supervisor, Fred McCarley, was dissatisfied with Britt's decision to handle his military duty in this manner.

According to the Plaintiff, McCarley began to retaliate against him because of his decision to use paid vacation days in order to fulfill his weekend military obligations. Plaintiff contends that he was denied the opportunity to attend a sufficient number of on-the-job training programs, compared with the opportunities received by the other technicians.[1] In addition, Plaintiff contends that he started receiving the least desirable work assignments.

In February 1986, and again in March, Plaintiff complained to the Department of Labor that he was being discriminated against and harassed by Georgia Power Company on the basis of his membership in the reserves. Plaintiff complained that the company was not cooperating with him in order to allow him to have off on the days that he needed to drill with his reserve unit. He also complained that Georgia Power did not make a contribution to the employee savings plan on his behalf for the two week period during which he took annual military leave. He also complained that his educational and promotional opportunities were not being adequately pursued by Georgia Power management.

Plaintiff received at least three responses from the Department of Labor ("DOL") regarding his complaints. Jan Lane, the DOL acting regional agent who was investigating his case, concluded each time that his rights were not being violated under the Veterans Reemployment Rights statute. In letters sent from Ms. Lane to Plaintiff, she informed Britt that he was not entitled to contributions to the employee savings plan while he was on military leave, because other employees on non-paid leaves of absence did not receive such contributions. Further, Georgia Power had offered Mr. Britt the opportunity to submit a form changing his particular deduction dates so that he could get the deduction despite his military leave, but that this was not done because Mr. Britt thought it was "too much trouble." In addition, Ms. Lane concluded that Mr. Britt's on-the-job educational opportunities were commensurate with the opportunities available to other technicians, and that his failure to obtain a promotion was most likely due to a slowdown in the industry. Ms. Lane further informed Mr. Britt that employers were not required to pay reservists on military leave, and were not required to reschedule work duties in order to avoid conflicts with an employee's reserve drills. An employee could not be forced to use vacation time because of his military duty; he or she must be allowed the opportunity to take unpaid leave, but the employer has no obligation to arrange an employee's schedule around his or her military duty. Finally, Ms. Lane noted that Georgia Power *voluntarily* makes up the difference between a reservist's normal salary and his military pay for up to ten days per year, and that Britt had been receiving these adjustments.

While pursuing his claims of harrassment and discrimination through the Department of Labor, Plaintiff chose to simultaneously pursue them through Georgia Power's Employee Concerns Program. Under this program, an employee may

1. These on-the-job training programs consisted of being sent to a company school to learn about new machinery, techniques or work-related systems.

bring any grievance gradually through successive levels of management at the company. Britt began complaining to his supervisor, Fred McCarley, about the conduct he perceived to be harrassment. Britt complained that he did receive the opportunity to work a sufficient number of overtime hours, that he was not sent to enough on-the-job training school sessions, that he was given undesirable work assignments, and that Mr. McCarley should arrange Britt's schedule such that he could be free to drill with his reserve unit without having to take vacation. He also objected to his pay level. Britt was the only employee working under the immediate supervision of Fred McCarley to use this grievance program.

Apparently feeling that his complaints to McCarley went unaddressed, Britt approached the next level of plant management to complain about his schedule, training opportunities, and the employee contribution plan. In response to Britt's complaints, a meeting was held on May 12, 1986, including Britt, McCarley, foreman Ned Davis and Steve Lee, superintendent of engineering. According to Plaintiff, Lee told him that he was a trouble maker and that he should be looking for another job. According to Lee, Lee told Plaintiff that his constant complaints indicated that the company couldn't do anything to make him happy, and if Georgia Power could not make him happy, perhaps he ought to think about finding employment where he could be happy. Plaintiff was informed that his complaints relating to his schedule, his school opportunities and contributions to his employee savings plan were unjustified, for the same reasons the DOL gave.[2]

On or about June 6, 1986, Britt met with plant manager, "Flip" Kee, and his supervisor McCarley, to discuss his "reserve problems." He once again complained about his schedule. He also suggested changes in the overtime policy, which normally was left to a supervisor's discretion. Finally, he complained about his past year's performance review. Kee, in his deposition,

testified that he did tell Britt that his constant complaining indicated that he had an attitude problem and that a poor attitude would be considered a negative factor in evaluating him for a promotion.

Britt then followed the company's Employee Concerns Program to the next level of management, that being Mr. Charles Hodges, the company's vice-president of power generation. During his meeting with Mr. Hodges, Plaintiff again complained about the company's failure to schedule his time around the weekends on which he wanted to drill with his reserve unit. He also complained about McCarley's alleged failure to send him to on-the-job training schools as often as other I & C technicians, his irritation over not having received a promotion or transfer to an accountant's position, and the alleged harrassment by his supervisors. In particular, Britt complained about having two "memoranda of discussion" placed in his file by McCarley. These memoranda are put in an employee's file to memorialize important discussions between an employee and his supervisor or other superior. They are not considered disciplinary actions, but were considered by Britt to reflect negatively upon him. At the end of the meeting, Hodges felt, based on what Britt told him, that the removal of the memoranda of discussion would help resolve his concerns. Hodges therefore ordered assistant plant manager Harvey Derrick to remove the two documents from Britt's file.

On or around July 16, 1986, Britt called Hodges to complain about the company's meal policy. Hodges explained to Britt that the company's policy was not to provide breakfast for employees working prearranged morning overtime. On July 22, Mr. Kee again met with Britt to discuss Britt's various complaints, but Britt refused to speak to him about them.

On the morning of July 23, 1986, Mr. Hodges called Mr. Kee and said he felt there was a need to sit down again with

---

**2.** It is important to note that Britt's employers did not know that he had complained to the DOL until much later.

Britt and attempt to resolve his complaints. Hodges recommended that all the parties involved, including Britt, meet in Atlanta at the company's offices in an effort to fully resolve all of his problems. Mr. Kee agreed that this was an excellent idea, particularly since Britt at this point did not want to continue to discuss his complaints with the management at the plant.

Soon after the call from Hodges, Mr. Kee received a call from the company's Equal Employment Opportunity supervisor, Willie Hinton, who explained that he wanted to get together with Kee and talk about some complaints he had been receiving from Britt. Kee then told him that Mr. Hodges had just suggested a meeting, and put Hinton in touch with Hodges. A few minutes later, Hodges called Kee and told him that a meeting was scheduled for 2:00 o'clock in Atlanta with Hodges, Hinton, Kee, McCarley, Britt, George Miller, an EEO Coordinator for the company, and Bill Head, the general office supervisor of Power Generation. Hodges told Kee to have Britt attend.

Kee then told Mr. McCarley about the meeting and asked him to tell Britt that he was to attend. McCarley found Britt and told him about the meeting, and that Britt was to attend. McCarley also told Britt that his travel expenses would be paid by the company. Britt refused to attend. McCarley then reiterated that Britt was required to attend the meeting. He told Britt that it was a direct order that he attend, and that the meeting was Britt's afternoon job assignment. Britt responded by telling McCarley that he refused to go. At this point, McCarley and Britt went to see Kee.

Kee explained to Britt the purpose of the meeting, and told him that attendance was his mandatory job assignment for the afternoon. Britt told Kee that he wanted to speak to Hinton, and walked out of Kee's office unexcused. Kee called Britt back into his office and told him that Britt worked for Kee and not for Hinton, that Britt's refusal to attend would be severe insubordination which could result in Britt's discharge. Britt then walked away again.

After this discussion, Kee called Hodges and told him that Britt was refusing to attend the meeting. Hodges told Kee to inform Britt one more time that he was being ordered to attend, and to explain the consequences if he did not attend. At that point, McCarley went out to Britt's work station, fully explained to Britt who would be there, that Britt's expenses would be paid for travel to Atlanta, and that Britt was required to attend. Britt again refused to go, saying that he was only interested in talking to George Head, senior vice president for power generation, who was the person senior to Mr. Hodges.

The meeting in Atlanta was held as scheduled, and was attended by those individuals mentioned above, including Hinton and Miller of EEO. When Britt had not arrived by 3 P.M., Hodges decided to place him on administrative suspension for insubordination. Because Britt was scheduled to go on his annual two week military leave a few days later, it was decided to wait until he returned to decide what to do in terms of additional discipline. During the time that Britt was on military leave, Kee and Hodges decided between them to give him a one week unpaid suspension upon his return as punishment for his insubordination in refusing to attend the meeting despite direct orders to do so.

The plant managers expected Britt to return from his military duty on Friday, August 8, 1986. Therefore, in accordance with Kee's instructions, McCarley began calling Britt's home in order to have him report to the plant on Monday, August 11. Unbeknown to the plant management, Britt had a weekend reserve drill at the end of his two week leave, so he was not home to receive McCarley's phone calls. However, Kee sent a registered letter to Britt requesting him to contact Kee immediately, which Britt apparently received on Wednesday, August 14.

On Thursday, August 15, Britt telephoned the plant and spoke with Kee. Kee told Britt that he needed to talk about his suspension and the events of the previous

two weeks. Kee asked Britt to come to the plant, but Britt would not agree to come in, and told Kee that he would talk to him the next day. Before the call ended, Kee emphasized to Britt how important it was that they sit down and talk about Britt's problems.

On the following day, Britt called Kee and told him that Britt was going to let the Department of Labor "handle the problem." At that point, after asking him in writing to come into the plant, and asking him over the telephone to come in for a meeting, Kee decided that he could do no more to get Britt to come into the office.

Following this telephone call, Kee discussed the situation with Hodges. Both men concluded that Britt had abandoned his job. At that point, Kee recommended that Britt be discharged. Hodges then discussed the matter with his superior, George Head, who approved of the discharge. On the following Monday, Kee sent Britt a letter informing him that effective August 16, he was terminated for refusing a direct order to attend the July 13 meeting, and for compounding that insubordination and suspension by refusing to come to the plant to discuss his situation with his supervisor, Mr. Kee. After Britt received that letter, he never made any attempt to contact the company or get his job back.

In a Notification of Result of Investigation Letter dated December 30, 1986, the Department of Labor informed Britt that they had fully investigated all of his complaints asserting illegal discrimination and retaliation by the company, including his suspension and subsequent discharge. The DOL found as follows:

> Based on results of the investigation, there is insufficient evidence to conclude that [Georgia Power] violated the obligations under the non-discrimination and affirmative action programs provision of the Vietnam Era Veterans Readjustment Act of 1974, 38 U.S.C. § 2012 by failing to promote or train the complainant. Evidence indicates that the Vietnam Era Veterans [sic] have participated among the promotions and are well represented

among the management to which Mr. Britt reports. In addition, evidence indicates that Mr. Britt was not harassed or retaliated against for filing his complaints with the OFCCP under the Vietnam Era Veterans Readjustment Assistance Act of 1974, 38 U.S.C. § 2012, as amended in that the company was unaware of his complaint at the time Mr. Britt was suspended for insubordination.

Mr. Britt now seeks relief from this court.

### I. *The Federal Claim*

Section 2021(b)(3) of the Vietnam Era Veterans' Readjustment Assistance Act provides:

> Any person who holds a position described in Clause (A) or (B) of subsection (a) of this section shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

According to the Supreme Court, the legislative history of the Act indicates that this section, "was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated *solely* by reserve status." *Monroe v. Standard Oil Co.*, 452 U.S. 549, 559, 101 S.Ct. 2510, 2516, 69 L.Ed.2d 221 (1981). [emphasis added]. *See also Clayton v. Blachowske Truck Lines, Inc.*, 815 F.2d 1203 (8th Cir. 1987) (discrimination must be based solely on status as a reservist). The relief available under the statute is equitable in nature, and includes reinstatement and back pay. A claim at law for damages is unavailable. *Ufland v. Buffalo Courier Express, Inc.*, 394 F.Supp. 199 (W.D.N.Y. 1974).

A thorough review of the record at this stage reveals that Plaintiff has completely failed to demonstrate that his discharge was related to his status as a reservist. Plaintiff's excuse for not attending the July 23 meeting, in violation of a direct order from his superiors, was that he felt he would be harassed, and that the meeting would serve no purpose. Even if these allegations were true, Britt's decision

to defy the direct orders of his superiors was an independent and significant reason for discharge. *Nulf v. International Paper Co.*, 656 F.2d 553, 559 (10th Cir.1981) (plaintiff herself provided a legitimate non-discriminatory rationale for her discharge by refusing to perform an assigned duty).

In an attempt to relate his discharge to his status as a reservist, Plaintiff argues that the circumstances surrounding his discharge were pretextual and that the discriminatory actions of Georgia Power produced his insubordination.[3] He claims that he was harassed, and eventually fired, because he complained about his treatment as a reservist.

This argument completely ignores the fact that all of his complaints relating to his treatment as reservist were totally unjustified. First, he desired to have his work scheduled around his weekend drills. An employer is not required to make such an accommodation. This is the specific holding of *Monroe*, 452 U.S. 549, 564–65, 101 S.Ct. at 2518–19. Second, Britt wanted the company to pay into his employee savings plan fund during his annual two week military leave. However, he was not entitled to such a contribution, as the Department of Labor informed him. Despite this, he could have received such a contribution had he been willing to fill out the appropriate forms; he failed to do so. Third, he claimed that he was not receiving enough overtime. However, a reservist is not entitled to work overtime to make up for hours missed while attending reserve drills. *Breeding v. TRW, Inc.*, 477 F.Supp. 1177 (M.D.Tenn.), *aff'd*, 665 F.2d 1043 (6th Cir. 1979). Further, the time records kept by the company indicate that Britt's scheduled overtime was only a few hours less than any of his peers; nowhere can he demonstrate that he was substantially behind in overtime hours.

These three complaints are the *only* reserve-related complaints that he made to the company. All were unjustified. Assuming that Plaintiff's allegations were true, that he irritated the plant management by bringing these complaints, and that the plant management subsequently dressed him down for doing so, this does not create a prima facie case of discrimination. Bringing *unjustified* complaints related to one's reserve duties does not constitute discrimination because one is a reservist. It constitutes "discrimination" because one has proved oneself a troublesome employee.

Mr. Britt also complained about the fact that his supervisor chose his shift to enforce the no-paid-breakfast policy, that he did not receive as many on-the-job training assignments as his co-workers, that he should have been paid more, that he was assigned to do extra "dirty work," and that his direct supervisors, McCarley and Kee, made him feel insecure about his future at Georgia Power. The court first notes that none of these complaints is related to his status as a reservist. The only argument that Plaintiff makes to connect these alleged retaliatory activities with his reserve status is the alleged temporal connection that these events supposedly had with his decision to switch from shift swapping to taking vacation leave in order to fulfill his weekend reserve duties. Plaintiff alleges that this decision irritated his immediate supervisor, McCarley, who then decided to harass him using the above techniques.

The timing argument is unsupported by the record. As the DOL found, Britt's opportunities to attend training schools were commensurate with those of his peers. Similarly, the work shift records from Georgia Power indicate that the specific tasks involving "dirty work," for which Britt alleges he was singled out, were divided according to a rotation system. With respect to the breakfast policy, the record remains uncontroverted that employees who showed up for prearranged overtime were not entitled to breakfast. The fact that some employees occasionally, due to the good grace or good mood of their immediate supervisor, sometimes have their breakfast paid for does not mean that Britt was singled out for illegal

---

3. *See e.g., Leonard v. City of Frankfort Electric & Water Plant*, 752 F.2d 189 (6th Cir.1985) (plaintiff antagonized into throwing helmet in direction of superior).

discrimination when he was refused a meal. Finally, Britt's allegations that his pay raises were inadequate and that he should have been promoted are totally unsupported by the record. All the records produced by the company indicate that his pay was in line with other technicians who had received similar performance reviews, and that he had, at times, been recommended for promotion. Further, he received all of the raises due him during the period in question. Once again, even with respect to non-reserve-related complaints, it seems that all of Britt's contentions were unjustified. There are no genuine issues of material fact supporting his claim.

■ Even if the substance of some of these complaints were true, and the court could somehow conclude that Britt's supervisor singled him out for dirty work because he was a reservist, plaintiff has not demonstrated that he is entitled to relief under the statute. Under the statute, a discriminated-against plaintiff is entitled to reinstatement, back pay, and compensation for tangible benefits of employment. There is no statutory authority for compensating the plaintiff for having to do dirty work or for emotional distress caused by having to deal with irritated superiors. As Britt's supervisor, McCarley had total control over Britt's work assignments. However, the decision to suspend Britt, and to dismiss him, was not made by McCarley.[4]

■ The only arguable connection between the type of "harassment" that Britt is alleging and a potentially compensable injury under the statute is that, somehow, the treatment Britt received from his allegedly irritated supervisor decreased his chances for promotion. However, to succeed on this theory, the Plaintiff would have to show that McCarley mistreated him because, in his heart, he was irritated by Britt's decision to take vacation time to fulfill his reserve duty. Other than Plaintiff's unsupported allegations that this is the case, the record does not support this connection. Even assuming that some of

Plaintiff's complaints about harassment were legitimate, a reasonable fact finder would *have* to conclude, in light of Britt's continuing series of *unjustified* complaints, that any irritation on the part of Britt's supervisors was a result of dealing with Britt's "attitude problem." This attitude problem resulted in Britt's refusing to attend a meeting in violation of direct orders.

In his deposition, Britt obviously assumes that every negative reaction on the part of any supervisor was caused by negative feelings toward Britt because of his reserve status. These inferences are totally unsupported by the record. It is true that at certain times his supervisors, most notably McCarley and Kee, expressed irritation at Britt. However, there is no connection between their actions and Britt's status as a reservist. To the contrary, the record demonstrates that Georgia Power had a very good record regarding its treatment of employees in the reserves.

Plaintiff has completely failed to demonstrate a prima facie case of discrimination. Even if the record could, somehow, be construed as establishing a prima facie case, then the reasons given by the company for Britt's termination are so resoundingly non-pretextual that there is simply no possibility of relief.

## II. *The State Discrimination Claim*

Plaintiff also argues that Georgia Power's treatment of him constituted a violation of the Georgia statute which requires that any person who leaves a position in order to perform a military service must be given an opportunity to return to his civilian job. Defendant argues that this statute is inapplicable because Britt failed to meet the necessary prerequisite of the statute, that being to make an application for reemployment within ninety days after being excused from military service. O.C. G.A. § 38–2–280. Plaintiff admits that he did not make such a reapplication. However, he argues that fulfillment of this

---

4. Although after Britt was initially suspended McCarley did write to Hodges and Kee recommending dismissal or transfer, both men indi-

cated that this letter did not affect their decision.

"exhaustion" requirement would be futile, and that the DOL made such an application on his behalf.

 Neither of Plaintiff's positions is supported by the record. First, the statutory requirement of reapplication is not an "exhaustion" requirement which can be waived on grounds of futility. It is a simple, black-and-white prerequisite for protection under the statute. Second, there is no evidence that DOL asked Georgia Power to reemploy Plaintiff. In fact, given that the DOL's investigation revealed that no discrimination had taken place, the record supports only the opposite inference, that being, that the DOL would not intercede on his behalf once he had been fairly discharged.

 Finally, it is doubtful that Plaintiff falls within the protection of § 38–2–280 even if he had met the necessary prerequisites. The statute is much narrower than the federal statute discussed above. It simply guarantees reemployment once one has been on military leave. Plaintiff was suspended before he took a scheduled military leave. His discharge resulted from his failure to meet with his superiors in their initially scheduled meeting, and his conduct after his suspension. He did not lose his position to a replacement because he was gone for two weeks. Thus, the Georgia statute offers him no relief.

### III. Emotional Distress

 Finally, Plaintiff makes a claim for damages and punitive damages alleging that his treatment by Georgia Power constituted intentional infliction of emotional distress. The court finds that Plaintiff has completely failed to allege conduct on the part of Georgia Power which would meet the narrow standard of conduct giving rise to a cause of action for intentional infliction of emotional distress. In order to state a claim, the defendant's conduct must have been "egregious and outrageous." *Sossen-*

*ko v. Michelin Tire Corp.*, 172 Ga.App. 771, 772, 324 S.E.2d 593 (1984). Here, even if one were to totally believe Britt's version of events, Britt has alleged nothing more than events surrounding a tense employment relationship. This will not support such a claim.[5]

To conclude, the record indicates that Britt's final year as a Georgia Power employee was tense, and that his constant complaints irritated his supervisors. It does not demonstrate that their irritation had anything whatsoever to do with his status as a reservist. He has failed to meet the statutory prerequisite for relief under the Georgia military antidiscrimination statute, and he has completely failed to state a claim cognizable as intentional infliction of emotional distress.

Defendant's motion for summary judgment is GRANTED.

---

5. This case is a far cry from the cas relied upon by Plaintiff, *Cummings v. Walsh Construction Co.*, 561 F.Supp. 872 (S.D.Ga.1983). There the court recognized a claim of intentional infliction of emotional distress by a former female employee who had been victimized by repeated and unwanted solicitation for sexual favors. Even if Britt's allegations of a threat to terminate him are true, this is not equivalent to sexually abusive conduct.