Francis X. RYAN, Plaintiff,

v.

BERWICK INDUSTRIES, INC., et al.

No. 4:CV–97–1258.

United States District Court,
M.D. Pennsylvania.

March 25, 1999.

Joseph E. CampBell, Law Offices of Joseph E. Campbell, Philadelphia, PA, for plaintiff.

Vincent Candiello, William E. Doyle, Jr., Morgan, Lewis & Bockius, Harrisburg, Douglas E. Ede, Miami, FL, John E. Hall, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, for defendants.

## *MEMORANDUM*

McCLURE, District Judge.

## *BACKGROUND:*

On August 15, 1997, plaintiff Francis X. Ryan commenced this employment discrimination action against Berwick Industries, Inc. ("Berwick") and Henry T. Doherty ("Doherty") with the filing of a complaint pursuant to the Veterans Reemployment Rights Act ("VRRA"), 38 U.S.C. §§ 4301–4307.[1] Plaintiff alleges that on August 15, 1991, defendant Doherty, former Berwick CEO, terminated plaintiff's employment with Berwick because of his participation in the United States Marine Corps Reserves. Plaintiff contends that such action constitutes employment discrimination under the VRRA.

Presently before the court are the following motions which are ripe for disposition:[2]

1. Plaintiff's motion for summary judgment, filed on January 20, 1999;[3]

2. defendant Doherty's motion for summary judgment, filed on January 20, 1999;[4]

3. defendant Berwick's motion for summary judgment, filed on January 20, 1999;

4. defendant Berwick's motion to strike plaintiff's demand for attorneys fees, filed on January 20, 1999; and

5. defendant Berwick's motion to strike the affidavit of Dirk Graham, filed on February 16, 1999.

For the reasons which follow, we will grant defendants' motions for summary judgment and deny plaintiff's motion.

## *DISCUSSION:*

### *I. MOTION FOR SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" FED. R. CIV. P. 56(c) (emphasis added).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there

---

1. By order dated January 13, 1998, the court dismissed plaintiff's state law claims for the intentional infliction of emotional distress; by order dated April 13, 1998, the court dismissed plaintiff's punitive damage claim; and by order dated December 31, 1998, the court granted summary judgment in favor of defendants as to plaintiff's claim under the Pennsylvania Military Affairs Act ("PMAA"). The only remaining claim in this action is plaintiff's claim under the VRRA.

2. On March 2, 1999, plaintiff filed a request for a hearing. Although this motion is not yet ripe for disposition, we will deny it as moot.

3. Berwick filed an opposition to plaintiff's motion for summary judgment on February 8, 1999. By order dated March 5, 1999, plaintiff's motion is also deemed opposed by Doherty on the basis of Berwick's opposing brief.

4. Doherty joins in Berwick's motion for summary judgment, but asserts an additional argument negating his own personal liability.

can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex* at 323, 325, 106 S.Ct. 2548.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Material facts are those which will affect the outcome of the trial under governing law. *Anderson* at 248, 106 S.Ct. 2505. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.1988).

## II. MATERIAL AND UNDISPUTED FACTS

In contravention to LR 56.1, plaintiff has failed to file a statement of material and undisputed facts in support of his motion for summary judgment. However, defendants have filed a counterstatement of material and undisputed facts in which they reference facts recited in plaintiff's memorandum of law in support of his motion for summary judgment. Therefore, we deem defendants as having had an opportunity to respond to plaintiff's facts as to whether they are supported by the record.

The following recitation of facts, deemed material and undisputed, is taken from these materials:[5] defendant's counterstatement of material facts; defendant's statement of undisputed material facts; and plaintiff's response to defendant's statement of undisputed material facts. The court's recitation reflects any disagreement or expansion in the facts as set forth by the parties.[6]

\* \* \* \* \* \*

At the time of the events giving rise to the complaint, Berwick Industries, Inc., was a manufacturer of decorative ribbons and bows. Henry T. Doherty was Berwick's president, CEO, and majority shareholder. He hired plaintiff to begin employment with Berwick on August 20, 1990. Plaintiff was not hired under the specific terms of a written employment contract; rather, an offer letter was signed by Doherty outlining his job duties and expectations. The offer letter, dated June 25, 1990, indicated plaintiff's job titles as, among others, Assistant to the President, Director of Berwick, and CFO/COO of Different Looks (a division of Berwick). Moreover, the letter indicated certain benefits plaintiff may be entitled to, such as a 401K Plan, Berwick stock purchase, 1% bonus based on pre-taxed profits, and use of a company car. Doherty also indicated his preference for plaintiff to relocate to the Berwick area so as to benefit his position with the company. It is undisputed that plaintiff never moved to the Berwick

---

5. For the purpose of deciding plaintiff's motion and defendants' motion, the factual recitation remains the same.

6. Both parties make reference to voluminous materials in support of their factual allegations. The court has omitted such facts which we deemed to be immaterial to the disposition of the present summary judgment motions, as well as facts that are otherwise conclusory in nature.

area, and that Doherty expressed his displeasure with plaintiff's decision in not doing so.

When plaintiff began employment at Berwick, he was a reservist with the United States Marine Corps. His military obligations entailed attending Active Military Duty one weekend per month and two weeks per year. In January, 1991, plaintiff informed Doherty that he was pending active duty mobilization for service in the Persian Gulf War. However, plaintiff was never "called up" for active duty. In March, 1991, after the War had ended, plaintiff's duties in the Marine Corps increased during the post-mobilization drawdown. It is undisputed that the time plaintiff took off from work to fulfill his military obligations became a point of contention between plaintiff and Doherty. Doherty characterized plaintiff as having "split loyalties" between Berwick and the Marine Corps.

During plaintiff's employment at Berwick, draft employment agreements were drawn up by Berwick's attorney, Robert Shields ("Shields"). However, a final agreement was never signed.[7] Plaintiff continued to engage in contract negotiations throughout his employment at Berwick. In light of these negotiations, Doherty indicated to Shields his intention to sell Berwick stock to plaintiff after the employment agreement was finalized. In order for Doherty to sell stock to plaintiff, other minority shareholders would have to relinquish shares so the sale of stock to plaintiff would not reduce Doherty's percentage of ownership.[8] However, once stock was offered to plaintiff for purchase, plaintiff indicated to Doherty that he could not afford the $240,000 purchase price.

When plaintiff began his employment with Berwick, he proposed hiring an assistant by the name of Chris Neddo ("Neddo") with whom he had worked at his former job. Doherty gave plaintiff the "go-ahead" to hire Neddo based upon plaintiff's recommendation.[9] She subsequently was hired as the office manager for Different Looks, and the company moved from Berwick, Pennsylvania, to Baltimore, Maryland, on plaintiff's initiative. Different Looks ultimately failed. Doherty terminated Neddo's employment with the company on the advice of David Hickman, President and CEO of Different Looks, who confirmed that Neddo was not satisfactorily fulfilling her job responsibilities.[10]

Meanwhile, plaintiff's salary and job responsibilities increased during his employment with Berwick. For example, he was elected to the Board of Directors on September 20, 1990, for which he received additional compensation in the amount of

---

7. There is a factual dispute as to why the contract was not signed. Suffice it to say that both parties have submitted documentary evidence to support the contention that plaintiff *and* Doherty, at different times, disagreed to terms as drawn up in draft employment agreements.

8. A shareholders agreement was drawn which included a provision for the sale of 60,000 shares of stock to plaintiff at $5.94 per share. However, Doherty decided to buy back two shareholders' stock pursuant to a negotiated early retirement arrangement with them. Therefore, the shareholders agreement was never signed.

9. Plaintiff had had a sexual affair with Neddo previous to coming to work for Berwick. There is a factual dispute as to whether plaintiff and Neddo had an affair during their employment with Berwick; however, Doherty

was concerned that such a relationship existed between plaintiff and Neddo during this time.

Plaintiff in 1991 commenced relations with another Berwick employee, Sherrie Schooley. There is a factual dispute as to whether this relationship began while plaintiff was still employed with Berwick.

10. It is undisputed that Hickman and Neddo did not see eye-to-eye in their working relationship. Specifically, Hickman was concerned that Neddo was passing confidential communications she overheard to plaintiff. Moreover, Hickman was dissatisfied with Different Looks' customer service, the area in which Neddo was in charge. Doherty advised plaintiff to terminate Neddo's employment with Different Looks.

$1,000 a month. He was also promoted on November 19, 1990 to Executive Vice President, with a resulting salary increase to $135,000. Finally, he received another promotion on March 15, 1991, and was given another salary increase to $150,000 on April 15, 1991.[11]

However, between the years 1990 and 1991, the company experienced a financial downturn. Berwick's pre-tax profit in 1990 was $5,011,291. In 1991, Berwick's pre-tax profit was $1,665,659. Berwick's lenders began complaining about profitability during this time. By the summer of 1991, Doherty and plaintiff had developed a hostile working relationship. The rift in their relationship was further cemented by a series of events, culminating in plaintiff's employment termination on August 15, 1991.[12]

## III. VRRA

Before we begin our analysis, we will highlight the section of the VRRA under which plaintiff brings his claim. Prior to 1994, § 2021 of the VRRA (which was renumbered § 4301 in 1992, and relevant parts of which were renumbered § 4311 in 1994), provided, in pertinent part as follows:

Any person who seeks or holds a position [in the employ of the United States government, state or a political subdivision thereof, or private employer] shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

38 U.S.C. § 2021(b)(3) (in 1992, renumbered § 4301(b)(3) pursuant to P.L. No. 102–568, § 506; in 1994, renumbered § 4311 pursuant to P.L. No. 103–353, § 2).

Plaintiff brings his claim under 38 U.S.C. § 4301(b)(3) [13], which provides in pertinent part as follows:

§ 4301. **Right to reemployment of inducted persons; benefits protected**

Any person who seeks or holds a position [in the employ of the United States Government, state or political subdivision thereof, or a private employer] shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

38 U.S.C. § 4301(b)(3).[14]

It is undisputed that this statute applies to Berwick as plaintiff's employer.[15] The

---

11. Plaintiff contends that his starting salary was negotiated at $100,000, a point with which defendant disagrees. However, the court deems this disputed fact to have no bearing on deciding the motions before us.

12. This series of events is factually disputed by the parties. However, the court finds that there is no genuine issue of material fact as to Doherty's belief that plaintiff was criticizing him to other Berwick employees; Doherty's belief that plaintiff commenced sexual affair with Berwick subordinates while employed with the company; and Doherty's displeasure with plaintiff's unwillingness to move to the Berwick, Pennsylvania, area. Suffice it to say, for the purpose of deciding the summary judgment motions before us, that it is undisputed that a hostile working relationship developed between plaintiff and Doherty in the months preceding plaintiff's employment termination with Berwick. Plaintiff offers no evidence from which a reasonable jury may

find that a hostile relationship did not in fact exist. The court need not here referee the finger pointing which seems to be on-going throughout this litigation.

13. Plaintiff brings this action under 38 U.S.C. § 4301(B)(3). However, his citation to the relevant part of the statute is in error, and should read as 38 U.S.C. § 4301(b)(3).

14. Although plaintiff brings this action under 38 U.S.C. § 4301(b)(3), we note that 38 U.S.C. § 3401 in 1991 was numbered 38 U.S.C. § 2021. The renumbering that occurred in 1992 did not alter the substance of the statute in any way. Both parties have referenced § 4301 throughout this litigation. Therefore, for the sake of continuity, the court will dispose of the motions in light of § 4301.

15. Doherty in part bases his motion for summary judgment on the grounds that he cannot be held personally liable under VRRA. This

issue, as framed by plaintiff, is whether or not "plaintiff was denied retention in employment and other incident or advantage of employment because of his involvement in the United States Marine Reserves." Plaintiff's Brief in Support of Motion, at 8. Defendants contend that plaintiff cannot recover here because under the VRRA, plaintiff must prove that his employment was terminated *solely* for reasons related to his participation in the United States Marine Reserves.[16] We agree with defendants, and for the reasons which follow, we will grant summary judgment in their favor.

■ We must first resolve the issue of the standard to apply to a VRRA claim. We begin with the proposition that the VRRA "was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, *motivated solely by reserve status.*" *Monroe v. Standard Oil Co.*, 452 U.S. 549, 559, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981)(emphasis added).

It is undisputed that plaintiff's cause of action accrued on August 15, 1991, the date his employment with Berwick was terminated. In 1995, Congress amended the VRRA[17] and provided that a violation of the statute occurs when "a person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a *motivating factor* in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service; ..." 38 U.S.C. § 4311(c)(1)(emphasis added). Congress, however, expressly determined that these amendments were *prospective. See Newport,* 91 F.3d at 1167 (citing P.L. No. 103–353, § 8(b), 1994 U.S.C.C.A.N. (108 Stat.) 3149, 3175–76). Therefore, since plaintiff's cause of action here accrued in 1991, we agree with defendants that the "sole motivation" standard, not the "motivating factor" test applies.[18] *See Newport,* 91 F.3d at 1167.

issue seems to be one of first impression in this circuit, according to Doherty. However, we will not reach the merits of this argument as we are granting summary judgment in favor of both defendants on other grounds.

16. In his reply brief, plaintiff argues that the denial of employment options and benefits is actionable separate and apart from his claim that his employment was terminated as a result of his military activities. However, the same analytical framework applies to both claims. That is, the court must apply the "sole motivation" test in determining whether plaintiff states a claim under the VRRA. *See Newport v. Ford Motor Co.,* 91 F.3d 1164, 1167 (8th Cir.1996); *Tukesbrey v. Midwest Transit, Inc.,* 822 F.Supp. 1192, 1194 (W.D.Pa.1993). In so doing, we find that no matter how plaintiff couches his claim, he cannot prevail under the standard used here.

17. The amended statute is entitled the Uniformed Services Employment and Re-employment Rights Act ("USERRA").

18. We are aware of the Second Circuit's decision in *Gummo v. Village of Depew, New York,* 75 F.3d 98 (2d Cir.1996), in which the court of appeals reversed the district court and held that the plaintiff, whose employment was ter-

minated in 1990, was not required to show that his reserve status was the sole motivation for his discharge. Rather, plaintiff had to show that his reserve status was a substantial or motivating factor in his discharge. In deciding to apply the motivating factor test retroactively, the Second Circuit relied on the following quoted portion of the report of the House of Representatives Committee on Veterans' Affairs accompanying the House bill that eventually became USERRA:

To the extent that courts have relied on dicta from the Supreme Court's decision in *Monroe v. Standard Oil Co.,* 452 U.S. 549, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981), that a violation of this section can only occur in the military obligation is the sole factor (see *Sawyer v. Swift & Co.,* 836 F.2d 1257, 1261 (10th Cir.1988)), those decisions have misinterpreted the original legislative intent and history of 38 U.S.C. § 2021(b)(3) and are rejected on that basis.

*Gummo,* 75 F.3d at 105 (underscore added)(parallel citations omitted). However, we decline to follow *Gummo* 's reliance on legislative history for the reasons eloquently stated by Judge Pollack in his dissenting opinion. We find the dissent of Judge Pollack to be fully persuasive on this issue. *Id.* at 109–111.

With the proper standard pin-pointed, we now turn to the analytical framework with which to apply the standard to a VRRA claim. The Title VII employment discrimination framework is typically applied to cases involving the VRRA.[19] *See, e.g., Tukesbrey,* 822 F.Supp. at 1195 ("...[I]t is appropriate to apply the burden-shifting mechanism developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)(parallel citations omitted), and its progeny for Title VII cases to VRRA cases."). *See also Sawyer,* 836 F.2d at 1262; *Britt v. Georgia Power Co.,* 677 F.Supp. 1169, 1174 (N.D.Ga.1987); *Weber v. Logan County Home for the Aged,* 623 F.Supp. 711, 714 (D.N.D.1985), *aff'd,* 804 F.2d 1058 (8th Cir.1986); *Fann v. Modlin,* 687 F.Supp. 218, 220 (E.D.N.C.1988).

The *McDonnell Douglas* test is a three-part burden shifting analysis that begins with the plaintiff carrying the initial burden of establishing a *prima facie* case of unlawful discrimination [Part I]. *See Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994)(citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). A plaintiff satisfies his burden here by establishing "that the employer's decision was motivated by plaintiff's membership in a protected class." *Tukesbrey,* 822 F.Supp. at 1195

(citing *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.1987)).

After the plaintiff has established a *prima facie* case of discrimination, the burden of production shifts to the defendant to " 'articulate some legitimate, nondiscriminatory reason' " for its employment decision. [Part II] *Fuentes,* 32 F.3d at 763 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). According to the Third Circuit in *Fuentes,* the plaintiff in a summary judgment context must then "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. [Part III]" *Fuentes,* 32 F.3d at 764 (citing, *inter alia, St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). To put it in another way, plaintiff has the ultimate burden of proving by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "Thus, if the plaintiff has pointed to evidence sufficient-

We are further guided by the United States Supreme Court in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), in which the Court reiterated that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483 (footnote omitted). In determining retroactivity, the Court explained that when a statute contains no express command, "the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, *increase a party's liability for past conduct,* or impose new duties with respect to transactions already completed." *Id.* at 280, 114 S.Ct. 1483 (emphasis

added). We are satisfied that the cause of action here accrued in 1991, and that the applicable law is the VRRA. Application of § 4311 here would increase defendants' liability for past conduct; therefore, the presumption against retroactivity prevails. Unless *Monroe* has been overruled (which it has not been, as of the date of this memorandum), then we are bound to follow the standard, that is, the sole motivation standard, set forth by the United States Supreme Court, in *Monroe.*

19. As defendants note in their memorandum of law in support of the motion for summary judgment, "[t]he Title VII pretext analysis must be modified to account for the fact that [here], the military discrimination is governed by a 'sole motivation' standard rather than the 'motivating factor' standard applicable to Title VII claims." Defendants' Memorandum of Law, at 9, fn 4.

ly to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case." *Fuentes*, 32 F.3d at 764 (citing *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122–24 (7th Cir.1994); *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir.1993) (underscore added)).

■ Upon completing the burden shifting analysis we conclude that summary judgment must be granted in favor of defendant. We are satisfied that plaintiff has carried his initial burden of establishing a *prima facie* case of unlawful discrimination. There has been evidence presented that indicates Doherty's displeasure with plaintiff's various absences from work in order to fulfill his military obligations. Therefore, plaintiff has established that Doherty's actions were motivated at least in part by plaintiff's membership in the Marine Corps Reserves. *See Tukesbrey*, 822 F.Supp. at 1199.

However, we find that defendant has also met his burden in Part II of the *McDonnell Douglas* analysis. That is, Doherty has articulated legitimate, nondiscriminatory business reasons, other than plaintiff's membership in the Reserves, for his decision to terminate plaintiff's employment with Berwick. These reasons, which the court examines in detail below, include Doherty's belief that plaintiff was criticizing him to other Berwick employees; Doherty's belief that plaintiff was commencing sexual relations with Berwick subordinates; and plaintiff's unwillingness to move to the Berwick, Pennsylvania, area.

In Part III of the *McDonnell Douglas* analysis, we find that plaintiff has pointed to insufficient evidence from which a reasonable jury could infer that the legitimate reasons offered by defendant were not his true reasons but were a pretext for discrimination. Therefore, we will grant summary judgment in favor of defendants.

## IV. DEFENDANT'S PROFFERED REASONS FOR TERMINATING PLAINTIFF'S EMPLOYMENT WITH BERWICK

### A. Defendant's Belief that Plaintiff was Criticizing Him

First, defendant Doherty has indicated that a reason for the breakdown of his relationship with plaintiff was because he believed plaintiff was criticizing him to other Berwick employees. Defendant in his deposition states:

> The relationship deteriorated when I found out that I was being criticized by [plaintiff] with employees and there was certainly an attempt to interfere with my relationship with a very key professional, Maura Abeln, in Berwick's legal relationship with her and Baker Mackenzie.

Doherty Deposition, at 171.

Defendant's belief is further corroborated by letters that he had written to Maura Abeln, discussing his concerns. In a letter dated August 6, 1991 (Ryan Exhibit 87), in which he discusses his decision to terminate Chris Neddo's employment with Different Looks, Doherty states:

> After I hired David Hickman as president of Different Looks it was determined that [Neddo] had to be terminated because of benign negligence in that division. As such [plaintiff] took her removal as a personal affront from me and did, in fact, start to try to denigrate my reputation and professionalism as well. In doing so I am finding out that he has been wildly accusing me of all sorts of things and trying to cause a rupture in my friendships with a lot of people—evidently yourself included. He has also criticized me with some of our employees, I have been told.

Supporting Documents to Berwick's Motion for Summary Judgment, Volume II, at Exhibit E. Plaintiff offers no evidence to rebut defendant's belief that plaintiff criti-

cized him to other Berwick employees.[20] Moreover, there is no evidence based on the record from which a reasonable jury could disbelieve defendant or infer that defendant's belief was in fact a pretext for discrimination. A reasonable jury can only conclude that based on the record, a hostile relationship had developed between the parties stemming from a number of issues, one of them being defendant's belief that plaintiff was criticizing him to other Berwick employees.

## B. Defendant's Belief that Plaintiff was Involved with Berwick Subordinates

Another issue which defendant contends led to the development of the parties' hostile relationship was what Doherty believed to be plaintiff's "sexual obsessions." *See* Doherty Deposition, at 172. Doherty stated that he believed plaintiff was undermining the company's morale. *Id.* Specifically, defendant believed that plaintiff was having a sexual affair with one of his subordinates, Chris Neddo. Plaintiff admits in his deposition that he informed Doherty of a prior relationship he had had with Neddo at their former place of employment, Murray Corporation. *See* Ryan Deposition, at 232. Defendant believed this relationship to be on-going while Neddo and plaintiff were employed with Berwick. Moreover, defendant believed plaintiff commenced a relationship with Sherrie Schooley, another Berwick employee, during his employment with the company.[21] The following exchange took place at Doherty's deposition:

> Q: In regards to the sexual relationship that you believe Mr. Ryan had with Ms. Schooley during his employment with Berwick Industries, what did you understand that relationship to be?

(a) It's amazing. I don't know if it's the time or what. I think I understand what you're asking. I would have considered, I believe, I have to retrospect, I would have considered that to be wrong at that time because I think about the time that this was brought to my attention I had met Mrs. Ryan and the four kids. I don't know exactly when that is, but somehow I put that all together. So I think that that disturbed me.

And it was also a point of conversation among the employees. And, again, the same thing as [Neddo], this leads to a general breakdown of order, and I can't exactly describe what I'm saying in that, but it's not good.

Doherty Deposition, at 206.

Plaintiff denies that this relationship started during his employment at Berwick. *See* Ryan Deposition, at 232. ·Again, his contention is not enough to rebut defendant's beliefs. A reasonable jury can only conclude that based on the record, defendant perceived defendant as having sexual affairs with Berwick subordinates, and this belief was one of the factors which led to the ultimate breakdown of the parties' relationship.

## C. Plaintiff's Unwillingness to Relocate

Another point of contention defendant states that he had with plaintiff was plaintiff's unwillingness to move to the Berwick area. Defendant in his deposition states, "I never could understand it, especially since he brought his wife and four children, I remember what they look like as well as his wife, to indicate to me his intent to move to Berwick and it never occurred. I just never could understand that." Doherty Deposition, at 173. Moreover, de-

---

**20.** Plaintiff in his Response to Defendant's Statement of Material Facts denies ever criticizing defendant. However, he points to no evidence in the record with which to back up his assertion. *See* Plaintiff's Response to Defendant's Statement of Material Facts, at ¶ 61. Moreover, it is not enough for plaintiff to

deny that he ever criticized defendant, since there is no evidence from which a reasonable jury can contradict defendant's *belief* that plaintiff criticized him.

**21.** At the time of plaintiff's deposition, he was engaged to be married to Schooley.

fendant's desire to have plaintiff move to the Berwick area was present throughout numerous communications between the parties. For example, in an interoffice memorandum to plaintiff dated April 4, 1991, Doherty states, "However, I can advise that I do not feel comfortable moving forward with a 100% commitment to you until you show me and Berwick a 100% commitment from yourself. I have always presumed that you would move to the Berwick area, which you promised to do during our original interviews." *See* Supporting Documents to Berwick's Motion for Summary Judgment, Volume I, at Exhibit A. In fact, plaintiff acknowledges defendant's desire to have him move to Berwick in a letter dated July 2, 1990. Plaintiff states, "We originally discussed my moving to Berwick and I noticed in your last letter that Different Looks is moving to Paramus. My concerns here are twofold. The first is that the cost of living in Paramus is significantly higher than in Berwick and I would like to know if there is some sort of temporary cost of living allowance we can discuss while I am in Paramus." *See id.* Plaintiff then took steps to obtain housing in Berwick, but never followed through with them. In an interoffice memorandum to Doherty dated May 24, 1991, plaintiff states, "I just want to keep you posted on the house. It turned out to be about $20,000 more expensive than I could afford. I decided not to extend an offer on the house." Defendant's response was as follows: "Frank—remember you got a very handsome increase recently, after you had made an offer on the house. Your base salary has also been increased 50% in less than a year." *Id.*[22] A reason-

able jury can only conclude that based on the record, defendant desired plaintiff to move to the Berwick area. Because the record shows plaintiff's awareness of Doherty's displeasure in failing to relocate almost a year after being hired, a reasonable jury could only conclude that this contributed to the rift in the parties' deteriorating relationship. Indeed, because Doherty hired plaintiff with the understanding that plaintiff would relocate to the Berwick area, *see* Offer letter dated June 24, 1990, at 2, a reasonable jury can only conclude that defendant's proffered reason is in fact legitimate and not merely a pretext for discrimination.

In sum, there has been no evidence presented from which a reasonable jury could infer that defendants' proffered reasons for its actions were a pretext for discrimination. As previously stated, defendant has articulated a number of reasons explaining the breakdown of the relationship between plaintiff and Doherty, and the ultimate termination of plaintiff's employment with Berwick. Throughout plaintiff's employment with Berwick, Doherty took issue with plaintiff in a number of different areas, such as plaintiff's refusal to move to the Berwick area; the belief that plaintiff was commencing sexual affairs with other Berwick employees; and the belief that plaintiff was criticizing him to other Berwick employees as well.[23] There is no basis in the evidence for a reasonable jury to disbelieve defendant's proffered reasons. As previously stated, defendant has come forth with evidence to support the fact that a hostile relationship existed between the parties. Absent any evidence to

---

22. It is undisputed that plaintiff and his wife were separated during his employment with Berwick. In the transcript for his divorce proceedings, plaintiff states that the breakdown of his marriage was caused in part by his wife's opposition to relocating to the Berwick area.

23. While defendant states that another reason which led to the parties' hostile relationship was the decline in Berwick's pre-tax profits in 1991 as compared to 1990, plaintiff states

that defendant's argument is retroactive since defendant could not have known such figures at the time of his employment termination. Plaintiff raises a question of fact as to whether the decline in Berwick's pre-tax profits was a factor in defendant's decision to terminate plaintiff's employment. However, because defendant articulates a number of other legitimate reasons for his decision, we find this issue to have no bearing on deciding the motions before us.

the contrary, defendant's motion for summary judgment must be granted.

## V. DEFENDANT'S DECISION TO TERMINATE PLAINTIFF'S EMPLOYMENT WAS NOT "SOLELY MOTIVATED" BY PLAINTIFF'S MILITARY ACTIVITIES

■ While it is true that a further point of contention between the parties was plaintiff's unavailability due in part to his military activities, we have established through our analysis as set forth above that defendant's decision to terminate plaintiff's employment was not *solely motivated* by plaintiff's involvement with the Marine Corps Reserves. Therefore, since plaintiff fails to satisfy the "sole motivation" standard, our analysis of plaintiff's claim of discrimination under the VRRA stops here. However, we note that the same rationale applies to plaintiff's claim of the denial of employment options and benefits. In order to succeed on this claim, plaintiff would have to show that he was denied these options and benefits solely based on his military activities. Based on the record, a reasonable jury could not reach that conclusion.

For example, in an interoffice memorandum to plaintiff and others, dated March 31, 1991, regarding the company's bonus system, Doherty states:

> As you are aware, we have been approached by Charles Dietrich to give very serious consideration to canceling the bonus system, not only because of increased debt, but also because of the nagging reality that we do not meet certain goals. We certainly did not as relates to SG & A expenses in 1990, and our increased inventory was certainly not enviable.
>
> Prior to our meeting in Philadelphia last Thursday, it was suggested once again that we cancel bonuses. While the issue has not become contentious, it certainly

is something we must give very careful consideration to.

> Therefore, I have made a decision that I am going to cancel bonuses for top management, which includes myself, [plaintiff], Jim Fink, Mike Stein and Pat Doherty. This decision has the greatest impact on me. I intend to have further discussions with the banks regarding the above decision. Perhaps a compromise might be made.

*See* Supporting Documents to Berwick's Motion for Summary Judgment, Volume II, at Exhibit E.

A reasonable jury can only conclude that plaintiff was not denied employment options and benefits based solely on his military activities. The memorandum referenced above shows that Doherty made executive cutbacks that included negative consequences to even himself.[24]

Plaintiff further contends that his employment contract was never finalized "because the probability of [plaintiff's] mobilization for active duty service with the United States Marine Corps was growing eminent [sic]." Plaintiff's Response to Defendant's Opposition at 4 (citing Ryan Deposition, at 1171). However, Doherty in his deposition states the following:

> Again, that was my perception, but the relationship deteriorated and one of the things also that disturbed me at no end was coming to contract, his sort of unwillingness to agree to noncompetes and confidentiality agreements and his insistence on things that he knew were deal breakers, like annuity contracts, which evidently in the documents are mentioned, . . .

Doherty Deposition, at 173.

Based on the record, a reasonable jury could not infer that plaintiff's employment contract failed to come to fruition solely because of his military activities. It is undisputed that both plaintiff and Doherty

---

24. Moreover, the record indicates that plaintiff was compensated at a rate comparable or even greater than other Berwick executives, and that he received numerous significant salary increases throughout his employment with Berwick.

did not see eye-to-eye on various contract terms. There is no evidence from which a reasonable jury can infer that defendant's proffered reason (that is, that he and plaintiff could not agree on the contract terms) was a pretext for discrimination.[25]

### CONCLUSION:

Based on the record, a reasonable jury could not find that plaintiff has established a claim for discrimination under the VRRA. That is, there is no evidence from which a jury could conclude that either plaintiff's employment was terminated, or plaintiff was denied employment options and benefits, based solely on his military activities. Therefore, defendants' motion for summary judgment will be granted, and plaintiff's motion will be denied.

---

**25.** Plaintiff asserts the same argument regarding the denial of stock options and a deferred compensation plan. Again, there is no evidence based on the record from which a reasonable jury can infer that plaintiff was denied these benefits solely because of his military activities.